575 F.2d 1223
 24 UCC Rep.Serv. 753
 Robert L. JACKSON, Trustee in Bankruptcy for Great Western
Automatic Sprinkler Co. and Fabrication and Supply
Co., Appellant,
v.
STAR SPRINKLER CORPORATION OF FLORIDA, Philadelphia National
Bank, High Point Sprinkler Company, a/k/a High Point
Sprinkler Co. of North Carolina, High Point Sprinkler
Company of Atlanta, High Point Sprinkler Company of the
Midwest, William F. Aldridge, FTM Sprinkler Company, Richard
W. Miller, George T. O'Laughlin, Protection Sprinkler
Company and Continental Automatic Fire Sprinkler Company, Appellees.
STAR SPRINKLER CORPORATION OF FLORIDA, Appellant,
v.
Robert L. JACKSON, etc., Appellee.
CONTINENTAL AUTOMATIC FIRE SPRINKLER COMPANY and Protection
Sprinkler Company, Appellants,
v.
Robert L. JACKSON, etc., Appellee.
FTM SPRINKLER COMPANY, Appellant,
v.
Robert L. JACKSON, etc., Appellee.
PHILADELPHIA NATIONAL BANK, Appellant,
v.
Robert L. JACKSON, etc., Appellee.
HIGH POINT SPRINKLER COMPANY OF ATLANTA, Appellant,
v.
Robert L. JACKSON, etc., Appellee.
HIGH POINT SPRINKLER COMPANY OF the MIDWEST, High Point
Sprinkler Company, a/k/a High Point Sprinkler
Company of North Carolina and William F.
Aldridge, Appellants,
v.
Robert L. JACKSON, etc., Appellee.
 Nos. 77-1197, 77-1218 to 77-1220 and 77-1223.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 16, 1977.
Decided April 26, 1978.
As Modified On Denial of Rehearing En Banc June 6, 1978.
 
 Duke W. Ponick, Jr., Morris, Foust, Beckett & Ponick, Kansas City, Mo., for Robert L. Jackson, etc., in these cases.
 James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Star Sprinkler Corp. of Fla., Philadelphia Nat. Bank, High Point Sprinkler Co., etc., High Point Sprinkler Co. of Atlanta, High Point Sprinkler Co. of the Midwest, William F. Aldridge, FTM Sprinkler Co., Protection Sprinkler Co. and Continental Automatic Fire Sprinkler Co. and for cross-appellant Robert L. Jackson, etc., in No. 1197.
 Harry P. Thomson, Jr., and Fred Wilkins, Shughart, Thomson & Kilroy, Kansas City, Mo., for Richard W. Miller and George T. O'Laughlin in No. 77-1197.
 Robert L. Wesner, Sedalia, Mo., John C. Milholland, Harrisonville, Mo., for cross-appellant Robert L. Jackson, etc., in No. 77-1197, for appellants in Nos. 77-1218, 1223 and 1234, Protection Sprinkler Co., Continental Automatic Fire Sprinkler Co. and High Point Sprinkler Co. of Atlanta, for Star Sprinkler Co. of Fla., FTM Protection and Continental in No. 77-1197 (appellees).
 Thomas J. Conway, Kansas City, Mo., for Philadelphia Natl. Bank, appellant in No. 77-1223, for cross-appellant Robert L. Jackson, etc., in No. 77-1197, for appellants in Nos. 77-1218, 1219, 1220, 1233 and 1234.
 Anderson & Milholland, Harrisonville, Mo., for appellant High Point Sprinkler Co. of Atlanta, in No. 77-1234; and for appellants, High Point Sprinkler Co., etc., and High Point Sprinkler Co. of the Midwest; and William F. Aldridge in No. 77-1234.
 Before GIBSON, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and LAY, Circuit Judge.
 GIBSON, Chief Judge.
 
 
 1
 This plenary action was brought by the trustee in bankruptcy of Great Western Automatic Sprinkler Company (Great Western) and Fabrication and Supply Company (Fabrication), alleging a conspiracy fraudulently to acquire the assets of the bankrupts. The trustee sought relief in multiple forms including damages, recovery of property or its value, and subordination of claims, from Star Sprinkler Corporation of Florida (Star), Philadelphia National Bank, High Point Sprinkler Company (High Point of North Carolina), High Point Sprinkler Company of Atlanta (High Point of Atlanta), High Point Sprinkler Company of the Midwest (High Point of the Midwest), William F. Aldridge, FTM Sprinkler Company (FTM), Richard W. Miller, George T. O'Laughlin, Protection Sprinkler Company (Protection), and Continental Automatic Fire Sprinkler Company (Continental).[1] The District Court[2] granted summary judgment on eight of the eleven counts of the trustee's amended petition[3] and on Star's counterclaim. The court designated that this judgment was final for purposes of appeal but retained jurisdiction over other claims of the parties. All parties appeal except Richard W. Miller and George T. O'Laughlin. We affirm in part, reverse in part, and remand.
 
 
 2
 With the encouragement of the District Court, the parties took part in a procedure called melding. In addition to stipulating to the authenticity of numerous documents, the parties exchanged narrative statements. They attempted to complete the factual picture by admitting the correctness of portions of the opposing parties' narratives. In this manner "melds" of admitted facts were created. In entering summary judgment, the District Court made limited findings of fact in its order of May 27, 1975, and relied on the authenticated documents and the stipulated facts. This was permissible under Fed.R.Civ.P. 56. In the present case, we consider the appeals on the record before us, which includes eleven briefs and an 871-page appendix.
 
 
 3
 Summary judgment is permitted under Fed.R.Civ.P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." All evidence must be interpreted in the light most favorable to the non-moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden is upon the movant to establish "his right to judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any possible circumstances." New England Mutual Life Insurance Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977); Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 209 (8th Cir. 1976); Percival v. General Motors Corp., 539 F.2d 1126, 1128 (8th Cir. 1976).
 
 
 4
 The claims involved in this case depend in large part on the provisions of the Bankruptcy Act, which must be applied carefully to the factual situation disclosed by the record. "Yet we do not read these statutory words with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). We are also mindful of the Supreme Court's directive that when a fraudulent scheme is involved the courts must be vigilant. "No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it." Pepper v. Litton, 308 U.S. 295, 312, 60 S.Ct. 238, 248, 84 L.Ed. 281 (1939). With these principles in mind we turn to the factual background[4] of this case.
 
 Factual Background
 
 5
 In 1965, Great Western was incorporated to engage in the business of installing automatic fire protection sprinkler systems. R. W. Miller prepared the Articles of Incorporation and served as its attorney from its inception. Fabrication was incorporated in 1966 by the shareholders of Great Western to carry on the fabrication side of the business; most of Fabrication's business was done with Great Western, its sister corporation.
 
 
 6
 During 1969, Great Western had gross revenues of $5,766,116.68 from its operations in approximately fifteen midwestern and southern states. Its principal place of business was 1544 Howell Street, North Kansas City, Missouri. By the end of 1969, Great Western was experiencing financial problems and had exhausted its line of secured credit at Roeland Park State Bank. It also had other debts including a substantial amount owed to Star for sprinkler heads, valves, and related devices that Star manufactured.
 
 
 7
 In January 1970, Philadelphia National Bank loaned Great Western $300,000 based on Star's guarantee of the loan and the agreement of Great Western and Fabrication to grant to Philadelphia National Bank a security interest in all of their then-owned and after-acquired property and assets. In July 1970, Great Western and Fabrication executed security agreements in favor of Philadelphia National Bank and Star. These were perfected by filing financing statements that same month. R. W. Miller drafted the security interests and was representing Great Western and Fabrication as well as Star. Outside of agreeing to continue its loan on a demand basis in December 1970, this loan was the only significant involvement of Philadelphia National Bank prior to the bankruptcy petition of Great Western.
 
 
 8
 During 1970, representatives of Great Western, Fabrication, and the secured parties met from time to time. On December 18, 1970, Roeland Park State Bank called its loan and applied $222,000 of Great Western funds to its debt. Star then declared Great Western and Fabrication in default on their security agreement and took temporary possession of their assets by posting security guards at the premises of the two debtors.
 
 
 9
 Star set up FTM as a shell corporation. It opened an account at Roeland Park State Bank in which Great Western's and Fabrication's receivables were deposited. Of the $1,810,027.37 deposited in this account, all except $95,000 was released to Great Western and Fabrication to continue in business.
 
 
 10
 On December 19, 1970, T. L. Mitchell, the president of Great Western, requested Star's president, William J. Meyer, to find outside management. On that day Star's president contacted William Aldridge, president of High Point of North Carolina, and invited him to a meeting concerning financially ailing Great Western and Fabrication. That meeting occurred on December 20 in Star's offices in Philadelphia. Present were Meyer, Aldridge and his accountant, and the shareholders of Great Western and Fabrication. It was agreed among those present that High Point of North Carolina would manage Great Western and Fabrication, and for its efforts High Point of North Carolina would have an option to obtain the shareholders' stock at no charge.[5] High Point of North Carolina's operations were to be subject to the security interests held by Star and Philadelphia National Bank. High Point of North Carolina, through Aldridge, took over the management of the two companies on December 23, 1970. Star then removed its security guards. By that time, R. W. Miller was representing Star, Great Western, Fabrication, and High Point of North Carolina.
 
 
 11
 During January 1971 and succeeding months, a composition of creditors was entered into by Great Western, Fabrication, approximately 900 general creditors, and possibly Star. Despite this, by the end of March 1971, High Point of North Carolina had decided not to acquire the stock of Great Western and Fabrication, and apparently all insiders had determined that voluntary petitions in bankruptcy should be filed.
 
 
 12
 High Point of North Carolina then formed High Point of the Midwest. Star then assigned its security interest to High Point of the Midwest and the latter firm is stipulated to have taken possession of all property of Great Western and Fabrication by April 26, 1971. High Point of the Midwest then commenced completion of the executory contracts of Great Western.
 
 
 13
 On April 27, 1971, Roy Groves, an officer of Great Western, Fabrication, and High Point of the Midwest, opened a checking account at Columbia Union National Bank in the name of High Point of the Midwest. At that time and later, a total of $540,275.92 in checks payable to Great Western and Fabrication were deposited in that account.
 
 
 14
 On April 30, 1971, Great Western was placed in voluntary bankruptcy, one day before the first payment to creditors was due under the composition agreement. Aldridge was appointed receiver on May 6, 1971. He ignored the advice of his court-appointed attorney and, acting on the advice of R. W. Miller, did not open a receiver's account. Instead, checks payable to Great Western continued to be deposited in High Point of the Midwest's account.
 
 
 15
 On May 17, 1971, a notice and order for the first meeting of creditors was sent to all creditors. It restrained and enjoined them from reclaiming, repossessing, or interfering with the property of the bankrupt. On May 21, 1971, Fabrication followed Great Western into bankruptcy. A similar order was issued regarding it on May 24.
 
 
 16
 At the first meeting of creditors on June 3, 1971, the bankruptcy judge refused to appoint Aldridge as trustee. Instead, another person was named who served until Robert L. Jackson was appointed on June 23, 1971. On June 7 and 8, 1971, the trustee secured injunctions against Aldridge, High Point of the Midwest, Star, FTM, and others, prohibiting their transferring any property or funds of the bankrupts. Despite this, movement of property and funds continued. Jackson shortly notified the contractors that the executory contracts of Great Western would not be completed by him as trustee.
 
 
 17
 Protection and Continental were then formed by John McVey and Charles Roult to complete contracts of Great Western.[6] Their principals were managers and officers of Great Western and Fabrication. Protection, Continental, High Point of North Carolina, and High Point of Atlanta (an affiliate of High Point of North Carolina) then contracted with Star to complete contracts on which Star had indemnified the bonding company. In completing these and other jobs of Great Western, the above companies except Star came into possession of tools and inventory of Great Western. These companies paid a portion of amounts received to Star in consideration of Star's not pressing any rights it had as a secured party to the collateral involved in this salvage operation.
 
 
 18
 The bonded and unbonded contracts of Great Western, including contractual requirements and warranty obligations, were completed by High Point of North Carolina, High Point of Atlanta, Protection and Continental, for which these companies received the unpaid contract balances due on those orders.
 
 Counts I and VI
 
 19
 In Counts I and VI, the trustee sought to recover for the allegedly fraudulent transfers of the assets of Great Western and Fabrication prior to bankruptcy. The relief requested was that the transfers be set aside and the defendants be required to return the property or account for its value, with interest, and other equitable relief. The petition alleged that the defendants acted pursuant to a conspiracy. The District Court entered judgment against all defendants[7] under these counts except Miller and O'Laughlin. The summary judgment provided joint and several liability in the amount of $2,158,999.01 plus interest on Count I (Great Western) and $439,604.32 plus interest on Count VI (Fabrication).
 
 
 20
 The trustee relies on § 70(d) and (e)(1) and § 67(d)(2)(a) and (d) of the Bankruptcy Act, 11 U.S.C. §§ 110(d) and (e)(1), and 107(d)(2)(a) and (d).[8] Section 70(d) relates to post-bankruptcy transfers. We will consider the trustee's rights to recover under it in a subsequent section dealing with Counts II and VII where the trustee also relies on § 70(d).
 
 
 21
 In both Counts I and VI, the trustee alleged that the defendant had "converted" the bankrupts' property. The use of that word resulted in the parties including extended arguments in their briefs and appearances before this court on whether or not the trustee could recover under these counts for conversion. The contest ranged from the presence or absence of subject matter jurisdiction to whether or not the consents of the bankrupts precluded conversion liability.
 
 
 22
 The District Court did not mention conversion in its final judgment on these counts. In his opening brief before this court, the trustee conceded that the District Court did not rule on the alleged conversion. In a subsequent brief, the trustee urged that we should consider conversion as an alternate theory on which to uphold the judgment. After carefully reviewing the petition and the arguments of the parties, we are convinced that the reason the District Court did not rule on the conversion claims is that none are stated in Counts I and VI. The petition seeks to void and set aside the transfers and recover the property or its value. This is the type of recovery provided in Bankruptcy Act § 70(e)(2).[9]
 
 
 23
 We recognize that Shainman v. Dean, 24 F.2d 475 (9th Cir. 1928), states that the trustee has an option under § 70(e) to sue for the property or its value or damages for conversion.[10] However, that statement was in response to a technical argument that the trustee had sought "damages" rather than recovery of the property or its value and that the Federal courts therefore lacked subject matter jurisdiction.[11] We do not believe that Shainman broadens the recovery under § 70(e) beyond recovery of the property or its value as provided in subdivision (2). As the Shainman court stated, "(W)hatever the form of action, or whatever the relief sought, the basis of the recovery is the goods or their value * * *." 24 F.2d at 476.
 
 
 24
 Turning to the statutory basis for recovery, we note that § 70(d)(1) provides in substance that if under State or Federal law a transfer is fraudulent as against or voidable by any creditor of the debtor with a provable claim, then it is null and void as against the trustee. The petition did not specify what State or Federal law made the transfer in question fraudulent. However, the District Court, in its May 27, 1975, memorandum, stated that Mo.Rev.Stat. § 428.020 (1969) was contravened. Because we conclude that the trustee is entitled to recover under § 67(d), we do not reach the issues under § 70(e)(1).
 
 
 25
 The District Court ruled in favor of the trustee and held the transfers to be fraudulent under § 67(d)(2)(a) and (d). Therefore, under § 67(d)(6)[12] the transfers were null and void against the trustee. There are several requirements for relief based on § 67(d)(2)(a) and (d). Subpart (2)(a) does not depend on actual intent, but requires an absence of fair consideration and that the debtor be insolvent or be rendered insolvent thereby. Subpart 2(d) requires actual intent to hinder, delay or defraud existing or future creditors. We need only consider subpart (2)(d) in affirming recovery under these counts.
 
 
 26
 The first requirement under § 67(d) is that there be a transfer. Transfer is defined as follows:
 
 
 27
 "Transfer" shall include the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor(.)
 
 
 28
 Bankruptcy Act § 1(30); 11 U.S.C. § 1(30). This is a broad and sweeping definition. H.R.Rep.No.2320, 82d Cong., 2nd Sess. 4, reprinted in (1952) U.S.Code Cong. & Admin.News pp. 1960, 1963. We have no difficulty in holding that the change in possession of all of the assets of Great Western and Fabrication to High Point of the Midwest that was completed by April 26, 1971, constituted a transfer as that term is defined in the Bankruptcy Act. However, defendants have urged that the only "transfer" involved in this case occurred in July 1970, when the security interests of Star and Philadelphia National Bank were perfected. That is the date on which the transfer was "deemed to have been made" for purposes of § 67(d) by virtue of § 67(d)(5).[13] An analysis of the scope and function of § 67(d)(5) is in order.
 
 
 29
 Congress recognized that the one-year or four-month limitation periods in the various parts of § 67(d), unless checked, would permit fraudulent transfers to become impregnable simply by their remaining secret for the requisite time. 4 Collier on Bankruptcy P 67.40 (14th ed. 1975). The check that Congress devised was subpart (5) providing that the transfer is deemed made, under this subsection, at the time it becomes so far perfected as to be valid against a bona fide purchaser. If it is never perfected, then it is deemed made immediately before bankruptcy.
 
 
 30
 There is no question but that the July 1970 perfection date is within one year of the bankruptcy of the present bankrupts. Thus, even with the aid of the earlier perfection, the transfer is within the period of attack under § 67(d)(2). However, the defendants seek a much broader reading of subpart (5). They urge that the date of perfection also applies as the date on which fraudulent intent under § 67(d)(2)(d) and insolvency under § 67(d)(2)(a) must be shown.
 
 
 31
 The writers of 4 Collier on Bankruptcy P 67.40, at 576-77 (14th ed. 1975) recognize several problems with treating the date of perfection as determinative for all questions. However, they assume, albeit reluctantly, that this is the proper construction. An example of the practical impact of this view is that a transaction might render a party insolvent but, through an unexpected windfall or gift, he might be solvent at the time when the last technical step in perfection occurred. Also, theoretically, a party might grant a security interest with fraudulent intent but have a pure heart when perfection occurred.
 
 
 32
 The present case provides another illustration with the chronological order reversed. There is no question but that the April 1971 transactions rendered the bankrupts insolvent; they had no assets and approximately one thousand unsecured creditors, with claims approximating one million dollars. As we note below, the bankrupts were not clearly insolvent in July 1970 when perfection occurred. Following the defendants' reasoning, the secured parties could have taken possession of collateral far in excess of their liens in April 1971 and not have run afoul of § 67(d)(2)(a) simply because the bankrupts were not insolvent in July 1970.
 
 
 33
 We decline to give § 67(d)(5) a construction beyond that needed to effectuate its purpose of combating secret transfers. Thus, transfers in § 67 are deemed to occur at the time of perfection for the purpose of applying the time limitations, not for the establishment of fraudulent intent or insolvency. Those depend on the time of the event or events enumerated in § 1(30). To rule otherwise would be to construe subpart (5) as a restrictive amendment on the definition of "transfers"; that is not its purpose.[14]
 
 
 34
 Section 67(d)(2)(d) requires that the transfer be made with actual intent to hinder, delay, or defraud existing or future creditors. Ordinarily, fraudulent intent is a question to be determined by a jury or by the court as fact-finder and not on a motion for summary judgment. Massey-Ferguson, Inc. v. Bent Equipment Co., 283 F.2d 12, 15 (5th Cir. 1960). However, Fed.R.Civ.P. 56 does apply and the question is one of the existence of material issues of fact. 6 Pt. 2 Moore's Federal Practice P 56.17(27) (2d ed. 1976). See also, SEC v. Geyser Minerals Corp., 452 F.2d 876, 880 (10th Cir. 1971); Fifty Associates v. Prudential Insurance Co., 450 F.2d 1007, 1010 (9th Cir. 1971); United States v. Canada, 425 F.Supp. 91, 93 (S.D.Ind.1977). We must examine the stipulated facts to determine if summary judgment on the issue of intent to hinder, delay, or defraud creditors was proper.
 
 
 35
 In December 1970, at Star's urging, management of the bankrupts was turned over to William Aldridge, president of High Point of North Carolina. That company received an option on all Great Western and Fabrication stock for the consideration previously noted. Aldridge kept in touch with Star; in fact all monies received were placed in an account of FTM Sprinkler Co., a shell corporation controlled by Star, with amounts released to Fabrication and Great Western to maintain a zero bank balance at the close of each banking day. The management by High Point of North Carolina, through Aldridge, continued until at least April 24, 1971, the day on which all assets were transferred to High Point of the Midwest.
 
 
 36
 After December 23, 1970, William Aldridge was president of Great Western and Fabrication as well as High Point of North Carolina. In that role he participated in the creation of a composition of unsecured creditors in January and February 1971. We will discuss that in greater detail below. The result of that composition was to stave off approximately 900 general creditors who had consented to the composition until at least May 1, 1971.
 
 
 37
 In the meantime, Great Western and Fabrication, under their new management, continued to operate. On or about January 29, 1971, a memorandum of understanding was executed reflecting the agreement under which High Point of North Carolina managed the bankrupts. Also at that time, two-year employment contracts were given to stockholders of Great Western and Fabrication by Great Western and High Point of North Carolina. These stockholders had given High Point of North Carolina an "option" to acquire all the stock of the bankrupts at no charge. The stockholders receiving employment contracts included T. L. Mitchell, T. R. Mitchell, R. W. Mitchell, J. J. McVey and C. A. Roult.
 
 
 38
 By March 28, 1971, High Point of North Carolina had decided not to accept the Great Western and Fabrication stock. A meeting was held in Star's Philadelphia offices on that day and continued the following day. Among the participants were R. W. Miller, attorney for Star and the bankrupts; William Aldridge, president of High Point of North Carolina and the bankrupts; and William J. Meyer, president of Star. They discussed the continuing financial problems of Great Western and Fabrication.
 
 
 39
 On March 29, 1971, R. W. Miller prepared the initial draft of the agreement between Star and High Point of North Carolina which was executed on April 24, 1971. On March 31, R. W. Miller and his partner O'Laughlin consulted with a bankruptcy specialist who was a "potential trustee." Events began to move swiftly. On April 15, 1971, High Point of the Midwest was incorporated in Missouri on behalf of High Point of North Carolina.[15] William Aldridge was president of this company. Thus, he was simultaneously president of High Point of North Carolina, High Point of the Midwest, Great Western, and Fabrication. Under Great Western documents, he was one of only two persons who could assent to contracts on its behalf.
 
 
 40
 R. W. Miller, during April, worked to qualify the newly formed corporation to do business in each state where the bankrupts were doing business. In at least some of the correspondence, the various state officials were told it was imperative that permission to operate be obtained by April 26, 1971.
 
 
 41
 On April 20, 1971, Miller, Aldridge, Meyer and others met again to discuss the situation. On April 24, 1971, Star and High Point of North Carolina executed the agreement referred to earlier. The agreement provided that in the event of a "terminal event" each party had certain obligations. Among the possible "terminal events" were Aldridge's electing to cease managing Fabrication and Great Western and the possible bankruptcy of either. Star agreed to transfer and assign to High Point of North Carolina all of its rights against the bankrupts and to cause Philadelphia National Bank to do the same. High Point of North Carolina agreed in essence to pay off the obligations of Great Western that were owed to Star or on which Star was liable except $200,000 of the balance due Star by Great Western on its account. The contract provided that High Point of North Carolina could avoid its obligations if "the referee in any such bankruptcy or reorganization refuses to permit High Point or one of its affiliated companies to complete the then contract work of Great Western."By April 26, 1971, High Point of the Midwest had taken possession of all of the bankrupts' property. On that day, Star assigned its rights under the security agreement to High Point of the Midwest. Utilizing the same facilities, address, and even stationery, High Point of the Midwest continued to operate in lieu of Great Western and Fabrication. It is stipulated that High Point of the Midwest was created to be a going business. It is undisputed that no effort to liquidate the assets took place, nor had any valid foreclosure of the lien created by the security agreement occurred. Until oral argument before this court, the defendants asserted that foreclosure had occurred in December 1970, despite the fact that both bankrupts continued to function and do business, including taking new orders, until the end of April. At oral argument, counsel admitted that their foreclosure position was untenable.
 
 
 42
 Counsel's belated admission is required by the stipulated facts. There has been no judicial foreclosure of the liens of Star and Philadelphia National Bank. Nor have the provisions of the Missouri Uniform Commercial Code pertaining to non-judicial foreclosure been met. Section 400.9-504 Mo.Rev.Stat. (1969)[16] provides the normal method of a secured party's disposing of collateral by sale after default. No attempt has been made to sell the collateral at a public or private sale; instead every effort has been made to utilize the bankrupts' assets to operate as going entities, with little, if any, regard for the unsecured creditors. In order for a secured party to retain the collateral in satisfaction of the indebtedness, the requirements of § 400.9-505(2) Mo.Rev.Stat. (1969)[17] must be followed. A secured party who proposes to retain the collateral must notify the debtor and other secured parties of the plan.[18] If a person entitled to notice objects then the sale provisions of § 400.9-504 apply. In the present case no notice has been given by the secured parties and the trustee certainly objects.
 
 
 43
 Section 400.9-207(4) Mo.Rev.Stat. (1969)[19] permits a secured party to "use or operate the collateral for the purpose of preserving the collateral or its value * * *." This section does not give a secured party a right permanently to appropriate the going concern value of the business. Essentially, § 400.9-207(4) reflects the fiduciary obligation of a creditor to manage and care for the assets pending judicial or Code foreclosure. When a secured party takes possession of collateral and fails to proceed to obtain a valid foreclosure, it acts at its peril. Star's possession and subsequent relinquishment with controlled or directed use of all of the assets of the bankrupts without a valid foreclosure placed Star in a fiduciary position in its use of these assets so that it properly should be called to account to the general creditors via the trustee for its stewardship.
 
 
 44
 We need only further note that Great Western filed for bankruptcy on April 30, 1971, at a time when it had no assets and one day before the first payments were due under the creditors' composition. Fabrication followed it into bankruptcy on May 21, 1971. William Aldridge, a central figure in the fraud, was appointed receiver in bankruptcy of Great Western on May 6, 1971. He continued in that position until June 3, 1971. His court-appointed attorney advised him to open a receiver's account at a bank and deposit all checks payable to Great Western in that account. However, Aldridge consulted with R. W. Miller, attorney for the secured parties and previous attorney for the bankrupts. Miller advised against opening a receiver's account and none was ever opened. It is also clear that some of the defendants ignored the restraining orders issued by the bankruptcy court.
 
 
 45
 The unmistakable picture painted by the stipulation is of a scheme to strip the bankrupt corporations of all assets. Further, it was to place those assets in a new corporation which would appropriate the going-concern value of the old corporations sans the claims of 1,000 general creditors. Finally, those general creditors would be left with empty corporate shells in the bankruptcy court. There is no material issue of fact remaining. These facts establish as a matter of law that the transfer was made with intent to hinder, delay, and defraud the other creditors. The value of the property is established by the record and the bankruptcy schedules filed by the bankrupts while they were controlled by Star and High Point of North Carolina. The trustee can recover under Counts I and VI.
 
 
 46
 Some of the defendants raise separate reasons why they should not be liable. In addition, the District Court dismissed the claims against attorneys Miller and O'Laughlin and the trustee cross-appeals. These matters must now be addressed. We agree with the court in Elliott v. Glushon, 390 F.2d 514 (9th Cir. 1967), that recovery under the Bankruptcy Act does not extend to permit a judgment against "conspirators" who did not receive the property transferred. See also, Duell v. Brewer, 92 F.2d 59 (2d Cir. 1937). Elliott v. Glushon, supra, requires our affirmance of the judgments dismissing the claims against Miller and O'Laughlin.[20] Similarly, the judgment against Philadelphia National Bank must be reversed; it has received none of the property except in the role of a depository of Star's funds.[21]
 
 
 47
 The remaining defendants are accountable under § 67 of the Bankruptcy Act; they received the property. In fact, some of them were set up to carry out the scheme as it developed and to complete contracts of the bankrupts. In doing so they took possession of inventory and tools which had been possessed by the bankrupts before April 24, 1971. Liability is not, contrary to FTM's assertion, based on respondeat superior ; rather it depends on receipt of property.
 
 
 48
 It has long been recognized that where parties acting in concert have received property of a bankrupt and have intermixed that property with their own, joint and several liability is appropriate.[22] Brainard v. Cohn,8 F.2d 13, 15 (9th Cir. 1925). We conclude that rule is applicable here. The bankruptcy estates should not bear the burden and expense of establishing which defendants received which property from the transfer. The defendants are thus left to allocate amongst themselves their respective shares of the overall liability as reflected in the District Court's judgments on Counts I and VI. Finally, we conclude that the District Court properly allowed interest. The defendants took over and utilized all of the bankrupts' property since 1971. Manufacturers' Finance Co. v. Marks, 142 F.2d 521, 528 (6th Cir. 1944).
 
 Counts II and VII
 
 49
 Under Counts II and VII, the trustee sought to recover under § 70(d) of the Bankruptcy Act, 11 U.S.C. § 110(d),[23] for post-bankruptcy transfers of the property of Great Western and Fabrication, respectively. It is alleged that High Point of the Midwest was the corporate successor of the bankrupts and caused their property to be transferred to the defendants. These counts were pleaded as alternate relief to the recovery sought, and as we have held, granted under Counts I and VI. The District Court granted summary judgment in favor of the trustee against all defendants except Miller and O'Laughlin. Joint and several liability was imposed.
 
 
 50
 On the facts of this case, the pre-bankruptcy transfer theory of recovery in Counts I and VI and the post-bankruptcy transfer theory of recovery in Counts II and VII are mutually exclusive. The Opening Brief of Robert L. Jackson states that on April 24, 1971, High Point of North Carolina and Aldridge caused all the property of the bankrupts to be transferred to High Point of the Midwest. It was also stipulated that by April 26, 1971, High Point of the Midwest had taken possession of all the bankrupts' property. These factual stipulations preclude recovery for post-bankruptcy transfers.
 
 
 51
 The checks received from third parties after April 26, 1971, were in payment of accounts receivable previously transferred to High Point of the Midwest. Other than those checks, we have found no reference to any property of which a post-bankruptcy transfer could be claimed. In the Answer Brief of Robert L. Jackson it is apparent that the trustee also viewed the two theories of recovery as mutually exclusive. He states: "It is clear that there can only be one satisfaction of a judgment in this case on one of the alternate counts applicable to each bankrupt." (Emphasis added.) For these reasons we reverse the judgment on Counts II and VII in favor of the trustee and affirm the judgment in favor of Miller and O'Laughlin.
 
 Counts III and VIII
 
 52
 In Counts III and VIII the trustee sought to recover from the defendants on the theory that under the Bankruptcy Act the security interests granted by Great Western to Philadelphia National Bank and Star were invalid. The trustee alleged that the granting of the security interests on July 14, 1970, constituted voidable fraudulent transfers under § 67(d)(2)(a) and (d)[24] and § 70(e)(1)[25] of the Bankruptcy Act, 11 U.S.C. §§ 107(d)(2)(a) and (d), and 110(e)(1). On the basis of the stipulated facts, the District Court dismissed these counts on the merits, effectively granting the defendants' motions for summary judgment.
 
 
 53
 On this appeal, we must determine whether the court erred in concluding that there was "no genuine issue as to any material fact and that the (defendants) were entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Each of the sections relied on has several prerequisites, but we will only discuss issues on which the trustee seeks to prevail.
 
 
 54
 One of the requirements for invalidating a security agreement under § 67(d)(2) (a) of the Bankruptcy Act is that the transfer or obligation be made or incurred without fair consideration. This is defined in § 67(d)(1)(e):
 
 
 55
 (C)onsideration given for the property or obligation of a debtor is "fair" (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.
 
 
 56
 In this case the stipulated facts conclusively establish that the liens received by Philadelphia National Bank and Star were only for the amount of indebtedness of Great Western and Fabrication. Certainly the amount loaned was not disproportionately small as compared to the lien given. The trustee's reliance on In re Peoria Braumeister Co., 138 F.2d 520, 523 (7th Cir. 1943), is misplaced. That case involved a lien requiring repayment of $3000 for a loan in the smaller amount of $2500. The court held that under Bankruptcy Act § 67(d)(6) the lien in bankruptcy was only valid up to the unpaid balance of the $2500 loan.
 
 
 57
 The trustee asserts the fact that the collateral was worth about three times the total secured debt establishes unfairness. We are not sure that mere disparity in collateral value to amount loaned would ever constitute failure to give fair consideration. Certainly a three-to-one ratio is permissible and fair where the collateral included rights to payment for uncompleted construction work. The security agreements are not invalid under § 67(d)(2)(a) of the Bankruptcy Act.
 
 
 58
 In order to invalidate a security interest under Bankruptcy Act § 67(d)(2)(d), it must have been "made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors." Obviously, there is no stipulation in this case as to the presence or absence of fraud. Instead the trustee seeks to establish the necessary intent, or at least a genuine issue of the existence of that intent, by noting the alleged presence of "badges of fraud."
 
 
 59
 Since the time of Queen Elizabeth I, the courts have recognized that certain factual situations are so unfair as to be evidence of the actors' fraudulent intent. Heath v. Helmick, 173 F.2d 157, 160 (9th Cir. 1949). It is elementary that showing the presence of "badges of fraud" continues to be a means of establishing intent to delay, hinder or defraud creditors. The courts have identified numerous such badges. See, e. g., Morris v. Holland, 529 S.W.2d 948, 953 (Mo.App.1975); Munford v. Sheldon, 320 Mo. 1077, 1083-84, 9 S.W.2d 907, 910 (1928).
 
 
 60
 In this case the trustee points to only three indicia of fraud that he claims are established by the stipulations. First, he claims the security interests granted were "transfer(s) of conveyance of all of the property of Great Western." We disagree; all that was transferred was a security interest to secure a lien for amounts advanced. The trustee also claims that "(t)he transfers were made for an inadequate consideration in the sense that an excessive security was given and taken." We have already determined that the consideration for the security interest was fair. It certainly was not a badge of fraud. Finally, it is suggested that the arrangements in July 1970 were made "at a time when Great Western (and Fabrication) were insolvent with the impending fear of bankruptcy." Uncertified balance sheets prepared in April and June 1970 reveal an excess of current liabilities over current assets. However, given the continuing efforts to rehabilitate the debtors, we conclude that the existence of recognized financial problems in mid-1970 does not raise a genuine issue as to fraudulent intent. The District Court correctly determined that the security interests were not invalid under § 67(d)(2)(d).
 
 
 61
 Bankruptcy Act § 70(e)(1) is a broad section incorporating methods under State and Federal law to void completed transactions. Obviously there are numerous legal theories available to the trustee under this section. 4A Collier on Bankruptcy P 70.78 (14th ed. 1976). Our task is simplified by the fact that on appeal the trustee only asserts rights under the Missouri fraudulent conveyances statute.[26] That section also requires intent to delay, hinder or defraud creditors. After examining the Missouri cases cited by the trustee, as well as more recent cases, we conclude that there is no genuine issue as to the presence of the requisite intent. This is not a case where the grantee of a Missouri conveyance gave up nothing in exchange for valuable property. In the Matter of Gervich, 570 F.2d 247 (8th Cir. 1978). With our usual deference to the district court on questions of State law, we agree that the security agreements are not voidable under Missouri law. Having concluded that the stipulated facts preclude recovery under the sections relied upon by the trustee, we affirm the summary judgment in favor of the defendants on Counts III and VIII.
 
 Count XI
 
 62
 In Count XI the trustee sought to recover from Star and Philadelphia National Bank for the breach of a composition agreement between themselves, the bankrupts, and nearly all of the general creditors. The trustee alleged that as part of this composition agreement Star and Philadelphia National Bank, as secured parties, agreed not to exercise their rights to collateral until the conclusion of a three-year period beginning May 1, 1971, over which payment of general creditors extended. The trustee claimed that the secured parties breached this by arranging for the bankrupts to be stripped of all assets prior to the bankruptcy filings on April 30, 1971, and May 21, 1971. The District Court granted summary judgment on this count in favor of Star and Philadelphia National Bank, stating that the trustee had not carried the "burden of proof imposed under applicable law." We must determine whether this was error under Fed.R.Civ.P. 56(c).
 
 
 63
 In December 1970, it was agreed that High Point of North Carolina would take over operation and management of Great Western and Fabrication. High Point expected eventually to receive the stock of the two corporations for its efforts in rehabilitating these financially ailing corporations. The precarious financial conditions of Great Western and Fabrication threatened to defeat the plan, therefore a meeting was held in Philadelphia on January 6, 1971, for the purpose of resolving these problems. Among the participants at that meeting were attorney R. W. Miller, William J. Meyer, president of Star, and Joseph L. Jackson, a vice-president of Star.
 
 
 64
 At the January 6, 1971, meeting the basic elements of a proposal to save Great Western and Fabrication were discussed. Among the elements was a plan for deferred or reduced payment of sums due general creditors and the Internal Revenue Service. This proposal was agreed upon at the January 6, 1971, meeting. On that date attorney Miller prepared an initial draft of a form letter to be sent to general creditors seeking their agreement to deferred or reduced payment.
 
 
 65
 That letter was sent to general creditors beginning on January 15, 1971. It recited that secured creditors had taken possession of all assets of the two companies on December 18, 1970. The letter requested general creditors to forego interest and carrying charges and to elect one of two plans for deferred or reduced payment. The choices were:
 
 
 66
 Plan 1) you take a promissory note for the full amount due your company as of December 31 payable in thirty-six (36) equal monthly payments with the first payment commencing May 1, 1971; or
 
 
 67
 Plan 2) you accept in full payment of the amount due your company as of December 31 a sum equal to fifty-two percent (52%) of that amount, to be paid August 1, 1971.
 
 
 68
 This letter proposing a composition also included these items:
 
 
 69
 If you elect Plan 1 and an agreement is reached with the other creditors, then a promissory note duly executed by both Great Western and Fabrication and Supply will be sent to you the first week of February.
 
 
 70
 In order to defray as much hardship as possible on creditors, such as you, and to try to salvage Great Western and Fabrication and Supply, the secured parties have also agreed to this arrangement. However, it is imperative that the agreement of all creditors be reached no later than January 29, 1971, and we thus request your attending to this promptly. Unless the agreement of creditors is obtained by January 29, 1971, then this proposed arrangement is withdrawn and the secured parties will proceed to liquidate the assets of Great Western and Fabrication and Supply to satisfy the amounts owed them. (Emphasis added.)
 
 
 71
 At the time of the proposed composition, there were approximately one thousand general creditors. Of these, 85 to 90% eventually accepted one of the proposed plans. In a letter dated February 4, 1971, attorney Miller advised the general creditors that the overwhelming majority of creditors of the companies had adopted one or the other of the two payment plans. Duly executed promissory notes were included with the letters to creditors accepting "Plan 1." In addition to these, attorney Miller prepared and sent letters to other creditors, and customers, suggesting that the composition had been effected and the companies would remain in operation. Similar representations were apparently made to the Internal Revenue Service and to the late Congressman William Hull in Washington, D. C.
 
 
 72
 To support the District Court's decision, the defendants have primarily relied on factual deficiencies in the trustee's case rather than challenging the trustee's legal theories. The defendants urge that there was no composition, that Star and Philadelphia National Bank were not parties to a composition and, even if there were a composition, no damages resulted. At oral argument, they conceded that their brief was erroneous in stating that the law required the assent of all creditors for the formation of a composition. The concession is well taken; the Supreme Court of Missouri has viewed that argument as untenable since 1899 unless the composition agreement expressly stipulates that all or a specified number must agree before the composition agreement is effective. Hill v. Wertheimer-Swarts Shoe Co., 150 Mo. 483, 491, 51 S.W. 702, 704 (1899).
 
 
 73
 Nor does the fact that some creditors who were not parties to the composition received different treatment affect the existence of a composition. This is because Star and the bank knew of the special treatment. 15A C.J.S. Compositions With Creditors § 14(f) (1967).
 
 
 74
 The January 15, 1971, letter stated that the agreement of all creditors by January 29 was imperative; however, promissory notes were sent to participating creditors in February in accordance with the preceding paragraph of the January 15 letter. That paragraph provided that notes would be sent if an agreement were reached with other creditors. Also, no action was taken to liquidate Great Western and Fabrication as threatened if agreement were not reached. Also significant is the number of general creditors; it is difficult to believe that sophisticated businessmen would propose a composition expressly conditioned on the assent of one thousand creditors within two weeks. Such uniformity of action by creditors of a failing company rarely occurs in the real world. Cf. 15A Am.Jur.2d Composition With Creditors § 9 (1976) (failure of a few to sign does not avoid composition). We hold that a composition of creditors is established by the stipulated facts of this case. Farmer's Bank of Dardanelle v. Sellers, 167 Ark. 152, 267 S.W. 591, 593-94 (Ark.1925). See generally, Ferguson-McKinney Dry Goods Co. v. Beuckman, 198 Mo.App. 41, 198 S.W. 504, 507 (1917); Tutt v. Price, 7 Mo.App. 194, 198 (1879).
 
 
 75
 A more difficult question is presented in determining whether Philadelphia National Bank and Star assented to that composition and how it affected their rights. The only basis suggested by the trustee for holding that the bank assented to the composition is a file memo by J. T. Ligget, an officer of the bank, describing a phone call from William J. Meyer, the president of Star, on January 15, 1971. In that call, Meyer described the terms of the composition and persuaded the bank to continue its loan on a demand basis at an increased rate of interest. The mere fact that the bank was informed of the composition does not establish assent. Neither is the continuance of the loan on a demand rather than term basis significant. Finding no assent by the bank, we affirm the District Court's dismissal of Count XI as it relates to Philadelphia National Bank.
 
 
 76
 Star concedes that assent to a composition can be established by conduct rather than a formal writing. Several circumstances and acts are relevant in this case. Attorney R. W. Miller had represented Great Western, Fabrication and Star throughout most, if not all, of the period from January 1970 through the 1971 bankruptcy filings. One possible inference to be drawn from the relationship of the parties is that Miller was acting on behalf of Star as well as the bankrupts when he sent the January 15, 1971, letter. Certainly no one has denied that Star knew of that letter and its contents. On the same day that it was first sent to general creditors, President Meyer of Star telephoned J. T. Ligget of Philadelphia National Bank and discussed the proposed composition and its terms as well as the cooperation needed from the bank. It is also important that Meyer and a vice-president of Star were present with attorney Miller at the January 6, 1971, meeting in Philadelphia where the composition plan was agreed upon by those in attendance. Finally, we note that Star permitted High Point officials to operate Great Western and Fabrication until April 1971. During that period it did not act to liquidate the bankrupts as the January 15 letter threatened would occur if general creditors refused to agree to the composition.[27]
 
 
 77
 In its brief, Star makes a vague argument that a secured creditor cannot be held liable for breach of a creditor's composition.[28] The authority it cites does not support that proposition and we have been unable to locate any case with such a holding. We recognize that fully secured creditors have little reason to agree to compositions. In this case, however, it is clear that Star was primarily motivated by its self-interest in retaining a going concern as the distributor of its equipment in the midwest region. It may also have been interested in ensuring that the distributor, i. e., Great Western, had management friendly to Star's interests. Whatever the motives, we are convinced that a genuine issue of fact exists as to Star's consent to the composition. Star was not entitled to judgment as a matter of law; the judgment in favor of Star on Count XI is reversed and remanded.
 
 
 78
 On this record we cannot determine the precise terms of Star's agreement, if any. Certainly one possible interpretation is that it agreed not to press its rights as a secured party during the three years required for payment of general creditors under the composition. Likewise, until the relative rights of the parties are more fully developed on remand, we decline to speculate as to what damages may be recoverable by the trustee under Count XI. It might well be, since the trustee has recovered the full value of the bankrupts' assets as of the date of transfer to High Point of the Midwest, that no damage has resulted.
 
 
 79
 The trustee urges equitable estoppel as an alternate basis for holding Star and Philadelphia National Bank liable for damages under the composition agreement. We are convinced that the bank was not sufficiently related to the representations made concerning the composition to be liable under this theory. As to Star, it is impossible on the present record to determine whether all the requirements for equitable estoppel have been met in this case.
 
 Star Counterclaim
 
 80
 In a separate counterclaim, Star sought to reclaim funds paid into the court under stipulations and orders dated January 11, 1972. Star alleged that it received these funds under contracts it entered into with High Point, Continental, and Protection after the bankruptcy of Great Western. Those companies had contracted with Great Western Surety to complete bonded jobs and had contracted with individual owners to complete unbonded jobs. Star alleged that High Point, Continental, and Protection paid these funds to Star in return for Star's release of its rights as a secured creditor to the contract retainages.
 
 
 81
 In its memorandum and orders dated May 27, 1975, the District Court stated: "(U)nder the factual circumstances as we have found them, judgment must be rendered against Star on its counterclaims." However, it stated that this was not meant to preclude recovery under an "independent equitable claim in connection with the ultimate disposition of Count IX."[29] Despite this apparent equivocation, the "Final Judgment" entered by the District Court on January 19, 1977, dismissed Star's counterclaim on the merits and provided that the judgment was final for purposes of appeal.
 
 
 82
 Only limited findings of fact were filed with this appeal and at oral argument counsel stated that the District Court had made no other findings. It is possible that the May 27, 1975, memorandum referred to the facts as stipulated when it stated, "(U)nder the factual circumstances as we have found them, judgment must be rendered against Star on its counterclaim." However, this language was not used in portions of that memorandum setting forth the disposition of the other claims.
 
 
 83
 As a result of this ambiguity regarding Star's equitable rights and the scarcity of factual findings, we are uncertain as to the basis and scope of the judgment on the counterclaims. Would this judgment bar equitable claims to the same funds? In any event, Star's claims to these funds, legal or equitable, should be settled together. We conclude that this portion of the judgment should be reversed and remanded for further proceedings and consideration by the District Court.
 
 
 84
 On remand, the District Court should carefully consider the principles and rationales of Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) and Polish v. Johnson Service Co., 333 F.2d 545 (3rd Cir. 1964). Each case involved an attempt by a bankruptcy trustee to recover construction contract retainages paid out after the bankrupt defaulted on its construction obligations. In Pearlman, the Court held that the surety bonding company that expended funds in paying the debts of the contractor for labor and materials was entitled to the amounts retained by the Government (owner of the property) under the contract with the bankrupt. Polish held that a subcontractor who completed the project was entitled to retain amounts paid to it by the owner of the property, even though the fund involved had been retained, pending the completion of the project, from amounts earned by the bankrupt.
 
 
 85
 Both of these cases relied on subrogation principles. They held that the money in question did not belong to the bankrupt. As Mr. Justice Black stated in Pearlman, "The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors." 371 U.S. at 135-36, 83 S.Ct. at 234.
 
 
 86
 According to the allegations in the counterclaim, the present funds are similar to those involved in Pearlman and Polish. If the averments are true, Star's title is derived from the completing subcontractors.[30] Under Pearlman and Polish, they may have had rights superior to those of the bankrupts. These issues are best resolved after the facts touching on the counterclaim are fully developed.[31]
 
 Conclusion
 
 87
 To summarize our holdings, in Counts I and VI we affirm the judgment of the District Court dismissing Miller and O'Laughlin. We also affirm the judgment against the other defendants except Philadelphia National Bank. The judgment against the bank is reversed and remanded with directions to enter judgment in its favor.
 
 
 88
 In Counts II and VII we affirm the judgment dismissing Miller and O'Laughlin. We reverse the judgment in favor of the trustee against the other defendants.
 
 
 89
 In Counts III and VIII we affirm the judgment in favor of all defendants.
 
 
 90
 In Count XI we affirm the judgment in favor of Philadelphia National Bank. We reverse and remand for further proceedings the judgment in favor of Star.
 
 
 91
 We reverse and remand for further proceedings and consideration the judgment against Star on its separate counterclaim.
 
 
 
 [1]
 Other claims involving Columbia Union National Bank, Roeland Park State Bank, Robert E. Miller and Robert E. Miller Insurance Agency, Inc. have been resolved or are still pending below. They are not involved in this appeal
 
 
 [2]
 The Honorable John W. Oliver, Chief Judge, United States District Court for the Western District of Missouri
 
 
 [3]
 No appeal is before this court regarding the judgment on Count V in favor of the trustee against High Point of the Midwest on an interpleaded fund of $73,105.10. A chart reproduced in six of the briefs filed by the defendants shows no appeal being taken from Count V. Defendants concede that the correctness of the judgment on Count V turns on the disposition of Counts I and VI
 
 
 [4]
 As printed in the appendix on appeal, all parties did not enter into a single set of stipulations. Several of the sets incorporate by reference facts stipulated between other parties. The factual matters set forth in this section of the opinion are included for the convenience of the reader. They are not intended to prejudice the rights of any party who may not have stipulated to all details
 
 
 [5]
 High Point of North Carolina also agreed to pay Aldridge's expenses and to use its credit for daily operations
 
 
 [6]
 McVey and Roult were personally liable as surety indemnitors on $1,500,000 of bonded contracts
 
 
 [7]
 The judgment was against Star Sprinkler Corporation of Florida, Philadelphia National Bank, High Point Sprinkler Company of North Carolina, High Point Sprinkler Company of the Midwest, High Point Sprinkler Company of Atlanta, Protection Sprinkler Company, Continental Automatic Fire Sprinkler Company, FTM Sprinkler Company, and William F. Aldridge. The District Court dismissed these counts as to Richard W. Miller and George T. O'Laughlin
 
 
 [8]
 For text of § 70(d) see note 23 infra
 Bankruptcy Act § 70(e)(1) provides:
 A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor.
 Bankruptcy Act § 67(d)(2)(a) and (d) provides:
 Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent without regard to his actual intent; or * * * (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.
 
 
 [9]
 Bankruptcy Act § 70(e)(2) provides in part:
 All property of the debtor affected by any such transfer shall be and remain a part of his assets and estate, discharged and released from such transfer and shall pass to, and every such transfer or obligation shall be avoided by, the trustee for the benefit of the estate: * * * . The trustee shall reclaim and recover such property or collect its value from and avoid such transfer or obligation against whoever may hold or have received it * * * .
 
 
 [10]
 It is significant, however, that a mere creditor cannot maintain a common-law action for conversion. 18 Am.Jur.2d Conversion § 124 (1965). Other cases seem to disagree with the Shainman view. Park v. Cameron, 237 U.S. 616, 618, 35 S.Ct. 719, 59 L.Ed. 1147 (1915); Siegel v. Municipal Capital Corp., 102 F.2d 905, 907 (2d Cir. 1939)
 
 
 [11]
 Since the trustee seeks recovery of the property or its value rather than "damages," Shainman supports our view that these counts do not state claims for conversion but rather statutory relief
 
 
 [12]
 Bankruptcy Act § 67(d)(6) provides in part:
 A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value(.)
 
 
 [13]
 Bankruptcy Act § 67(d)(5) provides:
 For the purposes of this subdivision, a transfer shall be deemed to have been made at the time when it became so far perfected that no bona fide purchaser from the debtor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, but, if such transfer is not so perfected prior to the filing of the petition initiating a proceeding under this title, it shall be deemed to have been made immediately before the filing of such petition.
 
 
 [14]
 The defendants assert that other circuits have reached different results. See, e. g., In re King-Porter Co., 446 F.2d 722 (5th Cir. 1971); Grain Merchants of Indiana v. Union Bank & Savings Co., 408 F.2d 209 (7th Cir.), cert. denied 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969); In re Turley, 92 F.2d 944 (7th Cir. 1937). Those cases involved attempts to set aside preferential transfers under § 60 of the Bankruptcy Act. They were not governed by § 67(d)(5), but rather by a distinct provision in § 60. Different considerations are involved in these two sections as is shown by the different legislative histories behind the provisions. 4 Collier on Bankruptcy P 67.40, at 569-71 (14th ed. 1975). In any event, our rationale would reach the same result in Grain Merchants and Turley as was reached by the Seventh Circuit. King-Porter did utilize the perfection date to determine whether the transfer was on account of an antecedent debt. That issue is not before us but appears to have been properly decided
 Without discussion the Fifth Circuit extended King-Porter in In re Wilco Forest Machinery, Inc., 491 F.2d 1041, 1047 (5th Cir. 1974), to a claimed fraudulent transfer under § 67(d). We decline to follow Wilco, although the practical result in that case may be consistent with the final result in the present litigation. In Wilco, the court affirmed the District Court's order requiring an accounting. In the present case, the District Court retains jurisdiction over the trustee's attempt to subordinate the secured parties' claims.
 
 
 [15]
 High Point of the Midwest was set up by High Point of North Carolina because the latter was non-union while Great Western and Fabrication had union labor. We think the result in this case would have been the same had the transfer been directly to High Point of North Carolina. In any event, the concern about labor problems reinforces the stipulation that High Point of the Midwest was intended to be a going concern
 
 
 [16]
 Section 400.9-504 Mo.Rev.Stat. (1969) provides in part:
 (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.
 
 
 [17]
 Section 400.9-505 Mo.Rev.Stat. (1969) provides:
 (2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. If the debtor or other person entitled to receive notification objects in writing within thirty days from the receipt of the notification or if any other secured party objects in writing within thirty days after the secured party obtains possession the secured party must dispose of the collateral under section 400.9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.
 
 
 [18]
 On the facts of this case, notice of any proposal to retain the property taken on April 24, 1971, should have been given to the trustee
 
 
 [19]
 Section 400.9-207(4) Mo.Rev.Stat. (1969) provides:
 (4) A secured party may use or operate the collateral for the purpose of preserving the collateral or its value or pursuant to the order of a court of appropriate jurisdiction or, except in the case of consumer goods, in the manner and to the extent provided in the security agreement.
 
 
 [20]
 If the attorney fees had been a ruse covering a scheme to split the spoils of a fraudulent scheme, liability of the attorneys would be proper. However, here there is no such suggestion, although the attorneys were very well paid
 
 
 [21]
 Our views in this opinion do not depend on the trustee's contention, with some evidentiary support, that Philadelphia National Bank deliberately filed false pleadings in the bankruptcy court to protect the fraud of Star. That issue is properly left to the District Court under claims still pending there to subordinate Philadelphia National Bank to the rights of general creditors
 
 
 [22]
 Joint and several liability is proper under these counts only if the defendants have acted in concert and have intermixed the bankrupts' property with their own. Broad conspiracy liability is not in keeping with the language and policy of the Bankruptcy Act
 
 
 [23]
 Bankruptcy Act § 70(d) provides:
 After bankruptcy and either before adjudication or before a receiver takes possession of the property of the bankrupt, whichever first occurs
 (1) A transfer of any of the property of the bankrupt, other than real estate, made to a person acting in good faith shall be valid against the trustee if made for a present fair equivalent value or, if not made for a present fair equivalent value, then to the extent of the present consideration actually paid therefor, for which amount the transferee shall have a lien upon the property so transferred;
 (2) A person indebted to the bankrupt or holding property of the bankrupt may, if acting in good faith, pay such indebtedness or deliver such property, or any part thereof, to the bankrupt or upon his order, with the same effect as if the bankruptcy were not pending;
 (3) A person having actual knowledge of such pending bankruptcy shall be deemed not to act in good faith unless he has reasonable cause to believe that the petition in bankruptcy is not well founded;
 (4) The provisions of paragraphs (1) and (2) of this subdivision shall not apply where a receiver or trustee appointed by a United States or State court is in possession of all or the greater portion of the non-exempt property of the bankrupt;
 (5) A person asserting the validity of a transfer under this subdivision shall have the burden of proof. Except as otherwise provided in this subdivision and in subdivision g of section 44 of this title, no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee: Provided, however, That nothing in this title shall impair the negotiability of currency or negotiable instruments.
 
 
 [24]
 For text of § 67(d)(2)(a) and (d) see note 8 supra. Section 67(d)(2)(a) and (d) only define certain transfers as fraudulent. Section 67(d)(6) gives the trustee the right to avoid them
 
 
 [25]
 For text of § 70(e)(1) see note 8 supra
 
 
 [26]
 Section 428.020 Mo.Rev.Stat. (1969) provides:
 Every conveyance or assignment in writing, or otherwise, of any estate or interest in lands, or in goods and chattels, or in things in action, or of any rents and profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, suit, judgment, decree or execution, made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands, or to defraud or deceive those who shall purchase the same lands, tenements or hereditaments, or any rent, profit or commodity issuing out of them, shall be from henceforth deemed and taken, as against said creditors and purchasers, prior and subsequent, to be clearly and utterly void.
 
 
 [27]
 We cite the failure to liquidate the bankrupts in January 1971 only as an indication that Star treated the composition as being established. We do not suggest that delay in foreclosure would create liability in a normal situation
 
 
 [28]
 The label composition has contributed to the unnecessarily complicated and confused posture of this case. The essence of Count XI is an allegation that the secured parties' actions resulted in their being contractually bound not to foreclose their security interests. Breach of that contract is now alleged to justify a judgment for damages
 
 
 [29]
 Count IX is not reproduced in the appeal appendix because the District Court did not rule on it. However, it appears to be a plea by the trustee that the claims of Star and Philadelphia National Bank be subordinated to all other debts of the bankrupts. After finding there was no just reason for delay, the District Court directed that the judgments on Counts I, II, III, V, VI, VII, VIII and XI and the Star counterclaim were final. See Fed.R.Civ.P. 54(b)
 
 
 [30]
 Under its contracts, Star purported to give up its rights as a secured creditor in these retained funds. As we read Pearlman, it is doubtful that Star had significant property rights to those funds where the bankrupt defaulted in performance. I. e., if the retainages were not the property of the bankrupt, a fortiori they were not the property of the bankrupt's secured party. Even if Star had no rights, the trustee's position would be weak. This is because under the Pearlman and Polish rationales the funds, to the extent required to complete the projects, belonged to the property owners and/or the surety. 371 U.S. at 141, 83 S.Ct. 232
 
 
 [31]
 Star also alleges in its counterclaim that it indemnified Great Western's bonding company on bonds issued after July 14, 1970. This may also be significant in light of Pearlman