FIFTY ASSOCIATES, Appellant,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee.

No. 71–2358.

United States Court of Appeals, Ninth Circuit.

Nov. 4, 1971.

Rehearing Denied Dec. 27, 1971.

James Powers, of Powers, Boutell, Fannin & Ridge, Phoenix, Ariz., for appellant.

Daniel T. Bergin, Robert H. Carlyn, Robert P. Robinson, of Fennemore, Craig, von Ammon & Udall, Phoenix, Ariz., for appellee.

Before MERRILL and KOELSCH, Circuit Judges, and BYRNE,* District Judge.

WILLIAM M. BYRNE, District Judge:

This appeal could be dubbed Phase Two of our efforts to effectuate a final resolution of this legal dispute. Originally, we vacated the foreclosure judgment entered in favor of Prudential (the district court having granted its motion for summary judgment) on the grounds that Prudential's allegations were insufficient to establish diversity jurisdiction and that its inclusion of the State of Arizona (Arizona State Tax Commission) as a defendant precluded the possibility of establishing such jurisdiction. Fifty Associates v. Prudential Insurance Company of America, 446 F.2d 1187 (9th Cir. 1970). In remanding to the district court, we stated that Prudential could renew its motion for summary judgment if (1) diversity jurisdiction could be established by amendments to the complaint which were consistent with our expressed views and (2) it could be demonstrated that the Tax Commission was not an indispensable party to the action and was dismissed from the case.

On remand, Prudential established diversity jurisdiction by properly amending its complaint to comply with the requirements of Title 28 U.S.C. § 1332. Additionally, it was able to demonstrate that the Tax Commission was indeed not an indispensable party to the action and

* Honorable William M. Byrne, Senior United States District Judge, Central District of California, sitting by designation.

it was eliminated as a party. (Arizona's tax lien had been discharged). After the jurisdictional impediments had been cleared away, the district court granted a new motion for summary judgment and entered a judgment of foreclosure in favor of Prudential. Fifty has appealed.

As part of a lease agreement executed in 1959 in which Fifty let certain real property located in Phoenix, Arizona, to Mayer-Central Building Company (Mayer) for a term of ninety-nine years, Fifty was required to subject its fee interest to a loan of $2,500,000 for construction of an eight story office building on the leased premises. In 1960, Mayer, in return for its promissory note, obtained the required loan of $2,500,000 from Prudential. Pursuant to the terms of the lease agreement, Fifty's fee interest was subjected to a mortgage executed by Fifty and Mayer for $2,500,000. Thereafter, the office building was erected.

Another feature of this lease agreement required Fifty to subject its fee interest to a subsequent mortgage if the mortgage loan did not exceed seventy percent (70%) of the appraised value of the property and improvements.

In early 1962, Mayer applied to Prudential for a loan of $5,400,000 on the property. Of this total, $3,400,000 was to be secured by Fifty's fee interest in the property.[1] Pursuant to this application, Prudential conducted a so-called "three draw" appraisal: (1) appraisal of the existing property; (2) appraisal of the property upon completion of a portion of proposed improvements; and (3) appraisal of the entire complex as proposed including adjoining property owned by Mayer.

Following its appraisal of the property, Prudential notified Mayer that its loan application had been approved. Thereafter, Mayer presented the new mortgage to Fifty which balked at signing unless it was first provided with an independent written appraisal of the property.

In response to Fifty's recalcitrance, Mayer solicited A. G. Oaks', Prudential's officer in charge of this loan, to issue a statement that the loan ratio was less than 70% of the property's appraised value. Acting thereupon, Oaks wrote two letters to Mayer who forwarded copies thereof as well as the mortgage documents to Fifty. Oaks' second letter contained the following statement: "It is not possible for us to disclose a precise valuation of a property. We can state that upon the disbursement of $3,000,000 now and $400,000 later, the loan amount will be approximately 70% of valuation." Following its receipt of these copies, Fifty executed the mortgage.

Beginning with the installment due February, 1965, and continuing thereafter, Mayer defaulted on its payments. Although it avoided a specific reference to Mayer's nonpayment, Fifty, in June, 1965, requested that Prudential notify it of any default prior to acceleration of the loan or commencement of any foreclosure action. On July 9, 1965, Prudential complied with this request by notifying Fifty that Mayer was in default and that Prudential was accelerating the debt and that its intention was to foreclose the mortgage after expiration of a ten day period during which Fifty could reinstate the loan.

On July 15, 1965, Mayer filed a petition for reorganization under Chapter X of the Bankruptcy Act. The district court entered a stay order prohibiting any interference with the possession or control of the property. Almost two years later, May 24, 1967, Fifty notified Prudential by letter that it did "not recognize the validity of that mortgage as against our interest in the property." The next day, May 25, 1967, but prior to its receipt of Fifty's letter of May 24, Prudential wrote to Fifty and reiterated its intention to institute a foreclosure action unless the default was cured within ten days after receipt of the letter. On May 29, 1967, two events occurred: (1) the Bankruptcy Court en-

---

1. The balance of this loan was not disbursed and is not in issue on appeal.

tered an order terminating Fifty's lease with Mayer and directing that the property be returned to Fifty subject to the rights of Prudential; (2) following receipt of Fifty's letter repudiating the mortgage, Prudential commenced the foreclosure action which has become the subject of this appeal.

We first address ourselves to Fifty's assertion that the district court acted without propriety when it granted Prudential's motion for summary judgment. In essence, Fifty maintains that Prudential's denials of the allegations [2] that it misrepresented the property's value to Fifty and that Fifty relied upon this misrepresentation have raised the spectre of genuine questions of fact.

■■ With this conclusion we cannot agree, for in reality Fifty has wrongly assumed that denying an allegation, *ipso facto,* creates a genuine issue of fact. Such an assumption is clearly contrary to the law. Minnesota Mining & Manufacturing Co. v. United States Rubber Co., 279 F.2d 409 (4th Cir. 1960); Piantadosi v. Loew's, Inc., 137 F.2d 534 (9th Cir. 1943). Fifty's misplaced assumption avoids the thrust of Prudential's denials, i. e., the nature of the "representation" was such as to deny Fifty a defense to the foreclosure action as well as to an independent cause of action. In short, Prudential's denials have placed in dispute the *legal* consequences of its "representation" and not the factual matters relating to accurate statements of value or to actual reliance upon said statements. Under these circumstances, we are satisfied that there is no merit to the contention that a motion for summary judgment was improper. Greyhound Corp. v. Excess Insurance Company of America, 233 F.2d 630 (5th Cir. 1956); General Accident Fire and Life Assurance Co. v. Prosser, 239 F.Supp. 735 (D.Alaska, 1965).

As already indicated, the Prudential officer in charge of the loan to Mayer, acting in response to the latter's prod-

ding, wrote to Mayer that it was "not possible to disclose a precise valuation" of the property but that upon disbursement of $3,400,000 "the loan amount (would) be approximately 70% of valuation." Following receipt of a copy of this letter, Fifty agreed to the terms of the new mortgage. On appeal, Fifty repeats its "concession" made below that "Prudential is entitled to a lien against the property in some amount," but renews the contention that its execution of the mortgage was induced by Prudential's "misrepresentation." Arguing that this "misrepresentation" is grounds for rescission, Fifty has set forth multiple reasons for negating the second mortgage. In our view, none of the approaches advanced by Fifty is persuasive.

■ Fifty's initial claim that the statement of value constituted a representation of fact glosses over the reality that land values cannot be calculated pursuant to a precise formula. Long ago, the Supreme Court recognized this fact of commercial life:

"* * * True, in large cities, where articles of personal property are subject to frequent sales, and where market quotations are daily published, the value of such personal property can ordinarily be determined with accuracy; but even there, where real estate in lots is frequently sold, where prices are generally known, where the possibility of rental and other circumstances affecting values are readily ascertainable, common experience discloses that witnesses the most competent often widely differ as to the value of any particular lot; and there is no fixed or certain standard by which the real value can be ascertained."

Montana Railway Co. v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890). This court has echoed this view by acknowledging that the question of land value "is generally a matter of opinion only." Sacramento Suburban

---

2. In response to Prudential's complaint, Fifty set forth separate defenses and a

counterclaim which included the denoted allegations.

Fruit Lands Co. v. Melin, 36 F.2d 907, 910 (9th Cir. 1929), cert denied Suburban Fruit Lands Co. v. Lindquist, 282 U.S. 853, 51 S.Ct. 31, 75 L.Ed. 756 (1930). Indeed, it is not without significance to this controversy that the Supreme Court of Arizona has recently ruled that an assurance that certain real property "was worth $7,500.00 per acre" was an expression of opinion and not a representation of fact. Page Investment Co. v. Staley, 105 Ariz. 562, 468 P.2d 589 (1970).

In the context of this case, it is clear that Prudential's assessment of the property's value amounted to no more than the proverbial "educated guess." While it is true this "education" was costly, Prudential having received $27,000 in appraisal fees, the ultimate conclusion was no more assured of factual accuracy than the ones reached by Fifty's own appraiser and the court appointed appraiser in the Chapter X proceedings.[3]

■ Our "appraisal" of the law as it applies to the facts of this case, has been held intact despite Fifty's accurate restatement of the law that an expression of opinion can be treated as a representation of fact when it is propounded by an expert. See, Eastern States Petroleum Co. v. Universal Oil Products Co., 24 Del.Ch. 11, 3 A.2d 768 (1939); Restatement of the Law, Contracts § 474.

■ We are of the persuasion that this general principle of law is without applicability to this dispute. As indicated in the record, Fifty is an enterprise which has been engaged in business for over 140 years. Its principal concern is in the field of real estate. By contrast, Prudential is a leading insurance company which invests premium income in real property mortgages. It engages in the appraising of land to aid in the eval-

uation of loan applications, not to conduct a personal service for others whose business concern is real estate investment. In the instant case, Prudential's appraisal was the product of this business practice. Accordingly, we cannot agree that Prudential acted as an "expert" when its appraisal was knowingly conveyed to a business that had specialized in real estate for almost a century and a half.

Under the circumstances of this case, we cannot agree with Fifty's position that it is entitled to rescission because it justifiably relied upon the statement of value made by Prudential's loan officer. As we see it, the expressed caveat that Prudential's appraisal was only an "approximation" served to make suspect this statement of value. Fifty's blind faith acquiescence to so suspicious an estimation raises serious questions as to the validity of its claim that it has been victimized by deception. Indeed, as noted by Prudential, under the agreement entered into by Mayer and Fifty, the latter was entitled to appraisals made by three certified appraisers in the event the property's value was in dispute. In such a context, it borders on the incredible to ask this court to negate the execution of a valid mortgage on the ground, in effect, that the executing party disregarded, inadvertent as it may be, a contractual proviso, and incurred unsatisfactory consequences as a result.

■ Part of the mortgage agreement in question was a letter written by Prudential to Fifty's counsel on December 14, 1962, which included the following statement: " * * * Prudential agrees that upon default in this loan and prior to the commencement of foreclosure of this mortgage, it will notify Fifty Associates of such action, and give Fifty Associates a period of ten days to cure such default before instituting foreclosure action." The scenario which

3. Fifty's own appraiser, who acknowledged that his estimation was merely an "expression of an opinion," determined the property's value as of December, 1962, to be $3,300,000. The court-appointed appraiser in the Chapter X proceedings estimated its value to be $3,100,000.

occurred after Fifty's receipt of this letter has already been told. In brief, some five months after Mayer's initial default in its monthly instalments on the mortgage note, Prudential notified Fifty of the on-going default and of its election to accelerate the loan and to institute a foreclosure action within ten days of notice if the delinquent payments had not been satisfied. Shortly thereafter, Mayer filed a petition for reorganization under Chapter X of the Bankruptcy Act, thus "neutralizing" the situation for almost two years at which time Prudential again notified Fifty of the default and the consequences resulting therefrom. Four days later, Prudential instituted its foreclosure action after it had received Fifty's letter repudiating the mortgage.

Arguing that the "notice of default" provision of the December 14, 1962, letter raises a genuine issue of material fact because it allegedly defies one interpretation, Fifty maintains that the granting of summary judgment was improper. See, Severson v. Fleck, 251 F.2d 920 (8th Cir. 1958). As Fifty views the language in question, Prudential had agreed to give notice *upon* default of the loan and not merely to give notice of its intent to institute a foreclosure action at the most lucrative opportunity, i. e., "let(ting) interest and costs accumulate over a long period of time and then subject(ing) Fifty's land to a mortgage lien far in excess of the original $3,400,000 * * *"

From our reading of this letter, the nature of Prudential's promise is clear: following a default by Mayer, Prudential was to notify Fifty of its intent to institute a foreclosure action unless within ten days Fifty made whole the default. As demonstrated by our recapitulation of the events following Mayer's default, Prudential's actions fully complied with the plain meaning of the mortgage agreement's terms.

Affirmed.