**CAPITOL WEST APPRAISALS, LLC,**
on behalf of itself and all others
similarly situated, Plaintiff,

v.

**COUNTRYWIDE FINANCIAL
CORP., et al., Defendants.**

No. C08–1520RAJ.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 28, 2010.

Raymond D. Schild, Boise, ID, Steve W. Berman, Thomas E. Loeser, Ari Y. Brown, Craig R. Spiegel, Genessa Ann Stout, Hagens Berman Sobol Shapiro LLP, Seattle, WA, for Plaintiff.

Brooks R. Brown, Goodwin Procter, Los Angeles, CA, David L. Permut, Sallie F. Pullman, Goodwin Procter, Washington, DC, D. Michael Reilly, John S. Devlin, III, Lane Powell PC, Seattle, WA, for Defendants.

## ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

This matter comes before the court on Defendants' motion to dismiss (Dkt. # 61). The Defendants requested oral argument, but the Plaintiff did not. The court finds the motion suitable for disposition on the basis of the parties' briefing and supporting evidence. For the reasons explained below, the court GRANTS the Defendants' motion (Dkt. # 61).

## II. BACKGROUND

Plaintiff Capitol West Appraisals, LLC ("Capitol West") filed a putative class-action complaint alleging that the Defendants[1] violated, *inter alia,* the Racketeer Influenced and Corrupt Organizations Act ("RICO"), based on activities in the mortgage business.

Mortgage brokers and lenders rely on appraisers' valuations of property in order to ensure that the mortgage is adequately collateralized. *See* Second Amended Complaint ("SAC") (Dkt. # 55) ¶ 26.[2] After appraisers review a piece of property, they typically either report an estimated value of the property or challenge the sale price the buyer and seller agreed upon. *See* ¶ 28. Some appraisers work directly for brokers or lenders; others work for multiple brokers or lenders as independent contractors. *See* ¶ 29. Capitol West appraisers work as independent contractors.

According to Capitol West, Countrywide worked with certain mortgage brokers who would sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans funded by Countrywide. *See* ¶ 147. Capitol West alleges that Countrywide encouraged appraisers to submit inflated appraisals that would support Countrywide mortgages: if an appraiser's valuation did not match Countrywide's target value, Countrywide would place the appraiser on a "Field Review List," an alleged blacklist. *See* ¶ 82.

If an appraiser was placed on the Field Review List, Countrywide would not accept an appraisal from that appraiser unless the mortgage broker submitted a report from a second appraiser. *See* ¶ 83. In that situation, the mortgage broker would have to pay for two appraisals. *Id.* According to Capitol West, Countrywide hired LandSafe to conduct a second "field review" appraisal whenever a broker submitted an appraisal from a listed appraiser. *See* ¶ 86. Thus, Capitol West alleges that Countrywide's use of the "Field Review List" encouraged mortgage brokers

---

1. This order will refer to the Defendants either collectively or in three groups: the first group will be collectively referred to as "Countrywide": Countrywide Financial Corporation ("CFC"); Countrywide Bank, FSB ("CW Bank"); Countrywide Home Loans, Inc. ("CHL"); Countrywide KB Home Loans, LLC; and Countrywide Tax Services Corporation ("CTS"). The second group will be collectively referred to as "LandSafe": LandSafe, Inc.; LandSafe Appraisal Services, Inc.; LandSafe Credits, Inc.; and LandSafe Flood Determination, Inc. Bank of America Corporation ("BoA") stands alone in the third group.

2. This order hereinafter cites paragraphs of the Second Amended Complaint with bare ¶ numbers.

to hire non-listed appraisers so that they could avoid the cost and time expended on a second appraisal.

Capitol West also alleges that its appraisers were asked to modify an appraisal on at least three occasions. When Capitol West appraisers refused to modify their appraisal, they were placed on the "Field Review List." *See* ¶¶ 90–91. Capitol West filed this lawsuit on behalf of all certified appraisers nationwide who were listed on the "Field Review List" or any other exclusion list by Countrywide and/or Land-Safe.

In a previous order (Dkt. # 53), the court denied the Defendants' motion to dismiss Capitol West's First Amended Complaint and granted the Capitol West leave to amend the deficiencies found in that Complaint. Capitol West filed a Second Amended Complaint, and the Defendants again moved to dismiss.

## III. ANALYSIS

### A. Legal Standards on a Motion to Dismiss.

When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "the court is to take all well-pleaded factual allegations as true and to draw all reasonable inferences therefrom in favor of the plaintiff." *Wyler Summit P'ship v. Turner Broadcasting Sys., Inc.,* 135 F.3d 658, 663 (9th Cir.1998). Facts alleged in the complaint are assumed to be true. *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1030 n. 1 (9th Cir.2002). The issue to be resolved on a motion to dismiss is whether the plaintiff is entitled to continue the lawsuit to establish the facts alleged, not whether the plaintiff is likely to succeed on the merits. *See Marksman Partners L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1304 (C.D.Cal.1996). A complaint must provide more than a formulaic recitation of the elements of a cause of action, and must assert facts that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

■ Furthermore, a complaint pleading a fraud claim is also subject to the requirements of Fed.R.Civ.P. 9(b). *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1104–05 (9th Cir.2003). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In meeting the particularity requirement, averments of fraud "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.,* 317 F.3d at 1106 (citing *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997)). Courts have held that Rule 9(b) applies to civil RICO claims. *See Odom v. Microsoft Corp.,* 486 F.3d 541, 553–54 (9th Cir.2007); *see also Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 541 (9th Cir.1989).

■ Given these pleading requirements, a plaintiff may not simply assert that the defendant made a false statement, but must at least "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1066 (9th Cir.2004). If the complaint alleges that several defendants participated in a fraudulent scheme, "Rule 9(b) does not allow a complaint merely to lump multiple defendants together but require[s] plaintiffs to differentiate their allegations ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP,* 476 F.3d 756, 764–65 (9th Cir.2007) (quotations omitted).

■ Even if a complaint is deficient, however, " '[d]ismissal without leave to

amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by amendment.' " *Intri–Plex Techs., Inc. v. Crest Group, Inc.,* 499 F.3d 1048, 1056 (9th Cir.2007) (quoting *In re Daou Sys.,* 411 F.3d 1006, 1013 (9th Cir. 2005)).

### B. Plaintiff's RICO Claim Remains Deficient.

#### 1. Elements of the Claim.

■ In order to state a civil RICO claim, a plaintiff must allege that one or more defendant "persons" conducted or participated in the activities of an "enterprise" through a pattern of racketeering activity consisting of at least two predicate acts cognizable under RICO. *See* 18 U.S.C. §§ 1961(5), 1962(c). RICO recognizes mail fraud and wire fraud, among other acts, to be "racketeering activity." *See* 18 U.S.C. § 1961(1)(B). The elements of mail fraud and wire fraud include "(1) a scheme or an artifice to defraud; (2) use of the U.S. mails or wires in furtherance of the said scheme; and (3) use of the mails or wires with the specific intent to deceive or defraud." *ITI Internet Services, Inc. v. Solana Capital Partners, Inc.,* 2006 WL 1789029 *8 (W.D.Wash. June 27, 2006).

The court previously found the Capitol West's RICO claim deficient, and the Defendants argue that the SAC's RICO claim still lacks particularized allegations as to the alleged fraudulent scheme; that Capitol West's allegations of mail and wire fraud are insufficiently pled; and that Capitol West fails to allege a cognizable RICO enterprise. The court will address each argument separately.

#### 2. The Second Amended Complaint Still Lacks Particularized Allegations as to the Alleged Fraudulent Scheme.

■ The SAC's allegations regarding the fraud include:

[Countrywide, LandSafe, and non-party mortgage brokers] [are] ongoing and continuing business organizations consisting of both corporations and individuals that are and have been associated for the common or shared purposes of excluding selected appraisers from obtaining any business related to real estate transactions in which Countrywide or Bank of America is the mortgage lender.

. . .

Countrywide and mortgage brokers operated as a continuing unit whose major purpose and common purpose was to place as many loans with Countrywide as possible.

. . .

In order to successfully steer as many borrowers as possible into inappropriate subprime loans and/or to write as much business as possible, Defendants need a system that allows them to effectively promote these loans which included "pushing" appraisers to meet contract values. The Countrywide Broker Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. Furthermore, the participation by the LandSafe subsidiaries in the Countrywide Broker Enterprise allows the enterprise to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities. LandSafe's participation in the enterprise allows the normal checks and balances within the mortgage process to be eliminated, permitting Defendants to advance their scheme and conceal the fraudulent activity they have been engaging in. It was important to LandSafe and Countrywide that LandSafe appear to be a distinct

company, *i.e.* be separately incorporated, because this allowed Countrywide and LandSafe to claim that LandSafe's appraisal functions were independent of Countrywide's loan origination functions, as required by federal and state regulations. As alleged herein, such claims were false.

. . .

Countrywide and LandSafe direct brokers to conduct a Field Review on non-compliant appraisers or to exclude certain appraisers[,] and [ ] Countrywide and LandSafe create and send the exclusionary list to brokers. The Countrywide Broker Enterprise has a common purpose in that the brokers each wish to place business with Countrywide and/or Bank of America and these banks want the business that the brokers generate . . . . it benefits the Enterprise to exclude any appraisers that do not "play ball."

. . .

¶¶ 148, 149, 152, 153. In addition to these claims, Capitol West argues that Countrywide made false and fraudulent statements in its letters to Mr. Massey regarding his appraisal reports on the Upper Fitchs Point and Rioja Street properties. *See* ¶¶ 8, 98, 100. Capitol West also claims that Countrywide "pressured Capitol West to increase valuations or vary from the USPAP on appraisals that Capitol West provided for three separate loan transactions" and that when Capitol West refused to do so, "Countrywide fraudulently placed Capitol West on the Field Review List." ¶¶ 90, 91. Finally, Capitol West argues that fraud occurred when a field review was performed on one of Mr. Massey's appraisals but not on a report by another appraiser that reached the same value. *See* ¶ 87.

■■■ Like the First Amended Complaint, the SAC simply states that the Defendants' conduct is fraudulent without explaining how or why. First, Capitol West still fails to explain why the Defendants' use of an exclusionary list of appraisers is fraudulent. The mere fact that the Defendants rejected Mr. Massey's appraisal values on the Upper Fitchs Point and Rioja Street properties for various reasons does not support an allegation of fraud,[3] and Capitol West does not present additional facts sufficient to establish that the Defendants' placement of Mr. Massey on the exclusionary list is fraudulent. In its opposition, Capitol West attempts to argue that the Defendants' placement of Mr. Massey on the list "necessarily conveyed to Mr. Fahrner and others that Plaintiff was an 'unacceptable vendor,' which was and is false." Pltf.'s Opp'n (Dkt. # 68) at 9. As the Defendants point out, this statement alleges a theory that is not alleged in the SAC, namely that the Defendants explicitly or implicitly conveyed the false message that Mr. Massey's work was untrustworthy. In determining the propriety of a Rule 12(b)(6) dismissal, "a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. California Dept. of Corr.,* 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) (emphasis in original). Thus, because the SAC does not explain why adding Mr. Massey to an exclusionary list is fraudulent, Capitol West fails to allege a fraudulent scheme with particularity.

---

**3.** The Ninth Circuit has acknowledged that "the question of land value is 'generally a matter of opinion only.'" *Fifty Assocs. v. Prudential Ins. Co. of Am.,* 450 F.2d 1007, 1010–11 (9th Cir.1971) (internal citations and quotations omitted). Matters of opinion "[are] not actionable as fraud, even if they are false." *Gass v. Schlotfeldt,* No. C05–5602RBL, 2006 WL 889745, at *2 (W.D.Wash. Mar. 31, 2006).

■ Second, Capitol West fails to adequately allege fraud in their claim that Countrywide pressured Capitol West to change its valuations or vary from the USPAP. Capitol West states that this occurred on "three separate occasions" but fails to identify the "'who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (citing *Cooper*, 137 F.3d at 627). Capitol West also fails to explain why such conduct is fraudulent. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir.2007) (noting that "Rule 9(b) 'requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations'") (citing *Schreiber Distrib. Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir.1986)). Capitol West's allegations that "brokers" pressured Mr. Massey to change the values of his appraisals and that Mr. Fahrner repeatedly asked him to change values on his appraisal reports (¶ 96) suffer from the same inadequacies; Capitol West fails to state when, how, and where these incidents occurred and also fail to specify the nature of the changes requested. Capitol West similarly fails to plead sufficient facts to support their argument that Countrywide representatives fraudulently told Mr. Massey to "push values." In fact, the SAC contradicts Capitol West's allegation that the Defendants pressured them to increase their appraisal values. For both the Upper Fitchs Point and the Rioja Street properties, the notices sent to Mr. Massey detailing the inadequacies in his appraisal reports stated that Countrywide found his valuations to be too high, not too low. *See* ¶¶ 98, 100.

■ Third, Capitol West fails to adequately support their argument that a field review of one of Mr. Massey's appraisals indicates fraud because a different appraiser later submitted the same value and was not subjected to such a review. As the Defendants point out, Capitol West fails to describe when or where the appraisals or field reviews occurred, the identities of the other appraiser and the reviewers, how the two appraisals were conducted, or how accepting the same value on a different appraisal report is fraudulent. Indeed, Defendants have argued that conducting secondary appraisals is a common business practice, not a racketeering activity, and that "contested appraisals cannot form the basis for a predicate act of fraud." *See* Defs.' Mot. (Dkt. # 17) at 11–12. Defendants also note that mortgage lenders accord weight to appraisers' opinions based on many factors other than the ultimate value reached, including "the validity of the appraiser's premises, procedures, and theories; the soundness of his factual determinations; the comparisons he has made; the methods he has followed, and the formulae he has applied." *Id.* at 12 (citing *United States v. Meyer*, 398 F.2d 66, 69 (9th Cir.1968)). Capitol West does not challenge these contentions. Thus, the court finds that Capitol West has failed to adequately allege that Defendants' conduct constitutes fraud.

### 3. The Second Amended Complaint Remains Deficient as to Allegations of Mail and Wire Fraud.

■ The SAC's allegations regarding the use of mail and wire facilities include the following:

> The Enterprises engaged in and affected interstate commerce because they engaged in the following activities across state boundaries: placing appraisers on the Unacceptable Vendor List for pretextual reasons and without due process; and the exclusion of appraisers appearing on the Field Review List from conducting appraisals.

> During the Class Period, the Defendants' illegal conduct and wrongful practices was carried out by an array of

employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products and funds by the U.S. mails and interstate wire facilities. For example, Devin Fahrner, a Countrywide Wholesale Account Executive in Boise, Idaho, was told by a Countrywide employee in California that Plaintiff Capitol West had been replaced on the Field Review List. This communication was made by interstate wires and was part of implementation of the Scheme in that it was a wire sent to exclude Massey because he refused to "push values" in violation of USPAP.

Defendants used the wires and mails to violate USPAP in other fashions as well. According to a confidential witness, as part of the Scheme, staff appraisers were told and ordered to call management if the appraised value came in at or above the value on the appraisal request form.

According to this confidential witness, LandSafe use a computer program called Sidex. Sidex would generate a "value" and appraisers were told that an appraisal that did not meet the Sidex value, would "kill the deal." If an appraisal came in below the Sidex value, management would call the appraiser and they would be "raked over the fire with questions and pressure." No questions were raised if the appraisal came in over value. According to this witness, the Sidex tool was not accurate as a tool to set values.

As part of the Scheme, appraisers were told via transmissions over the Interstate wires to attend meetings with lenders to discuss how to "push values" as indicated in this email transmission between a LandSafe Field Valuation Manager, Stuart Hayashi and Bailey Greene, a loan officer at the Glendale, California Branch:

Stuart, if you and your folks can accommodate us, the 8/11 9 am meeting, that would be ideal.... There are some things we would ideally like covered in this meeting (if you don't mind). Those items would be:

. . .

(3) *How and when we should push values*—how everyone should use the [Sidex computer product] before committing to take a larger deal, etc....

. . .

This scheme used the mails and wires on at least the following occasions: 3/18/2008: email Dorothy Lim of Countrywide to Capitol West; 3/17/2008: Dorothy Lim email to LandSafe's Jo Hallum; 1/9/2008: email Hallum to Lim and Cheryl Rowland at LandSafe; 3/17/2008: email Lim to "USA UVL Review"; 3/11/2008: Letter to Massey using U.S. mails. Each of these mails were sent to effectuate the scheme of excluding Mr. Massey under fraudulent pretenses.

The nature and pervasiveness of the scheme, which was orchestrated out of Countrywide's offices, necessarily required those offices to communicate directly and frequently with brokers by the U.S. mails and by interstate wire facilities.

. . .

The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved thousands of communications throughout the Class Period including telephone, email and U.S. Mail communications to brokers regarding the blacklisting of the appraisers appearing on the Field Review List or who were to be outed by Countrywide and/or LandSafe; the transmission by email and/or U.S. mail of appraisals prepared by appraisers who did not appear on the Field Review List or "out list"

and the use of fraudulent HUD–1 forms to complete transactions. In addition to these RICO predicate acts, it was foreseeable to each Defendant that it would communicate with the brokers by the U.S. mails and by interstate wire facilities. Further, each Defendant has, in furtherance of the scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local offices or divisions.

¶¶ 165–69, 171–72, 174.

The Defendants contend that Capitol West's new allegations fare no better than those made in the First Amended Complaint. The court agrees. While the above paragraphs attempt to address the court's concerns as set forth in its previous order, the SAC still fails to meet Rule 9(b)'s particularity requirements. Capitol West alleges that the emails between Dorothy Lim, Jo Hallum, and Cheryl Rowland are evidence of a fraudulent scheme, but Capitol West fails to establish *how* the emails were fraudulent or furthered the alleged fraudulent scheme. Like the First Amended Complaint, the SAC is deficient because it does not identify any false statement made by any Defendant; Capitol West merely states that the Defendants used the mails and wires in various ways in furtherance of the scheme. *See Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir.1989) ("Rule 9(b) requires that the pleader state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.").

As noted above, Capitol West attempts to introduce a new theory in their Opposition, namely that "placing Plaintiff on the ["Field Review List"] constituted a false representation by Defendants to brokers and others that Plaintiff is an unacceptable appraiser because its appraisals are untrustworthy." Pltf.'s Opp'n (Dkt. # 68) at 9. However, as this allegation was not made in the SAC, the court will not consider it for Rule 12(b)(6) purposes. *See Schneider*, 151 F.3d at 1197 n. 1. Capitol West fails to show that any of the alleged communications were fraudulent, and in fact some of the communications are acknowledged by the parties to be true statements, meaning that Capitol West cannot show mail and wire fraud by referring to those statements. *See In re Epogen & Aranesp Off–Label Mktg. & Sales Practices Litig.*, 590 F.Supp.2d 1282, 1289 (C.D.Cal.2008) (finding that a mail and wire fraud allegation was not supported when the plaintiff failed to set forth how a statement on the defendant's website was fraudulent).

The court also notes that the SAC does not solve a problem identified in the court's previous order, namely that it is still unclear from the Complaint how the alleged fraudulent scheme worked. Like the First Amended Complaint, the SAC alleges that the Defendants pushed appraisers to inflate their valuations, *see* ¶ 90, but confidential witness statements also allege that Countrywide found some appraisers' valuations to be too high. *See* ¶ 92. Indeed, Mr. Massey's valuations for the Upper Fitchs Point and Rioja Street were criticized as being too high. *See* ¶¶ 98–103. Capitol West has not pled with adequate particularity how and when the Defendants used the U.S. mail or interstate wire to further the alleged fraudulent scheme. *See Odom*, 486 F.3d at 554 (holding that under Rule 9(b), "the factual circumstances of the fraud itself must be alleged with particularity").

### 4. Plaintiff Also Fails to Allege a Cognizable RICO Enterprise.

A valid RICO claim requires "allegations of the conduct of an enterprise through a pattern of racketeering activity that proximately caused injury to the

plaintiff." *Swartz v. KPMG LLP,* 476 F.3d 756, 760–61 (9th Cir.2007). The Ninth Circuit has held that an association in fact constitutes a RICO enterprise if it has a "common purpose," "an ongoing organization," and a "continuing unit." *Odom,* 486 F.3d at 552–53. More recently, the Supreme Court held that an association-in-fact enterprise must have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.,* —— U.S. ——, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009). The Court emphasized that associations require "interpersonal relationships" and a "common interest" or "common purpose." *Id.*

■■■ The SAC alleges two alternate associations-in-fact as RICO enterprises: the "Countrywide Broker Enterprise" and the "Countrywide Enterprise." The "Countrywide Broker Enterprise" consists of "(1) Countrywide, including its separately incorporated LandSafe loan closing services subsidiaries, (2) Mortgage Integrity, Home Mortgage Resources, Hunter Creek Mortgage, Clearwater Mortgage, New Line Mortgage, Path Finders Mortgage and American Home Key, and (3) other mortgage brokers who have contracts with Countrywide pursuant to which they sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide." ¶ 147. The "Countrywide Enterprise" consists of "(1) Countrywide and (2) Countrywide's subsidiaries, including its LandSafe loan closing services subsidiaries." ¶ 156.

### a. The Countrywide Broker Enterprise

In the SAC, Capitol West responded to the court's previous order, which found that "[t]he Plaintiffs' allegations do not sufficiently plead 'Countrywide Broker Enterprise' as a RICO enterprise because

the Complaint does not assert that the brokers worked together with the Defendants toward a common purpose or as a continuing unit," and that "all of the mortgage brokers are unnamed, and the Complaint does not identify any specific transaction with any particular broker." *See* Order (Dkt. # 53) at 9, n. 4. In the SAC, Capitol West names several mortgage brokers alleged to be part of the "Countrywide Broker Enterprise." ¶ 147. Capitol West also alleges that the enterprise "operated as a continuing unit whose major purpose and common purpose was to place as many loans with Countrywide as possible … the Countrywide Broker Enterprise had the common purpose to exclude non-compliant appraisers." ¶ 149. Capitol West alleges that the structure of the Countrywide Broker Enterprise is that "Countrywide establishes and maintains a list of excluded appraisers and transmits that list to mortgage brokers throughout the country. Mortgage brokers understand that if they wish to place a loan with Countrywide, they must not use an excluded appraiser." ¶ 154.

Defendants claim that Capitol West still fails to allege a plausible common purpose for the Countrywide Broker Enterprise, because brokers have no incentive to place loans with Countrywide as opposed to their competitors, and because there are no allegations about how or why thousands of independent mortgage brokers worked together with Countrywide for a common purpose. *See* Defs.' Reply at 6. The court agrees. Capitol West's allegations describe a system wherein brokers have an incentive to generate loans, but the allegations do not explain why the brokers have any incentive to place loans with Countrywide. Paragraph 152 describes Countrywide's goal of "successfully steer[ing] as many borrowers as possible into inappropriate subprime loans and/or to write as much business as possible," but it is un-

clear how or why brokers would have any reason to help Countrywide—instead of Countrywide's competitors—achieve that goal. Thus, the SAC does not contain any allegations suggesting the interconnectivity required for a valid RICO enterprise.

### b. The Countrywide Enterprise

█ The SAC is also deficient as to the Countrywide Enterprise, which consists of Countrywide and its subsidiaries, including LandSafe. Though ¶ 156 includes an allegation that "Countrywide has separately incorporated and purports to operate LandSafe distinctly from itself in order to appear to comply with state and federal regulations requiring independence between the loan origination process and the appraisal process," as Countrywide points out, this allegation lacks any explanation of how this "façade of independence" facilitated the alleged unlawful activity. Defs.' Reply at 7. Particularly where Capitol West continues to argue that LandSafe was not independent from Countrywide (see ¶ 152), the court finds that the SAC, like the previous version of the Complaint, fails to satisfy the "distinctiveness" requirement.

### C. Plaintiff's Claim for Violation of the California Common–Law Duty to Provide Fair Procedures Is Deficient.

#### 1. Elements of the Claim.

The California common-law doctrine of fair procedure "protects against arbitrary decisions by private organizations under certain circumstances." *Sound Appraisal v. Wells Fargo Bank, N.A.*, 717 F.Supp.2d 940, 945 (N.D.Cal.2010) (citing *Potvin v. Metro. Life Ins. Co.*, 22 Cal.4th 1060, 1066, 95 Cal.Rptr.2d 496, 997 P.2d 1153 (2000)). One of the earliest decisions applying common law principles to a private organization's exclusion of individuals from membership was *James v. Marinship Corp.,*

where the California Supreme Court found that

> where a union has … attained a monopoly of the supply of labor by means of closed shop agreements or other forms of collective labor, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal organizations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living.

25 Cal.2d 721, 731, 155 P.2d 329 (1944). Later, courts refined and further developed the doctrine. In *Pinsker v. Pacific Coast Soc. of Orthodontists (Pinsker I )*, the court applied the doctrine to a professional organization that determined the standards for the practice of the profession. *See* 1 Cal.3d 160, 81 Cal.Rptr. 623, 460 P.2d 495 (Cal.1969). The *Pinsker I* court noted that

> Because of the unique position in the field of orthodontics occupied by [defendant professional organization] and its constituent organizations, membership therein, although not economically necessary in the strict sense of the word … would appear to be a practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty. Defendant organizations hold themselves out to the public and the dental profession generally as the sole organizations recognized by the [American Dental Association], which itself is a virtual monopoly, to determine standards … for the practice and certification of orthodontics. Thus, a public interest is shown, and the associations

must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications.... Under the circumstances, an applicant for membership has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, including the showing of cause for rejection.

*Id.*, 1 Cal.3d at 166, 81 Cal.Rptr. 623, 460 P.2d 495.

In *Pinsker v. Pacific Coast Soc. of Orthodontists* (*Pinsker II* ), the court confirmed this application of the doctrine. *See* 12 Cal.3d 541, 116 Cal.Rptr. 245, 526 P.2d 253 (Cal.1974). The *Pinsker II* court elaborated on the requirements of fair procedure, noting that "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial" and that the method chosen should "provide an applicant adequate notice of the 'charges' against him and a reasonable opportunity to respond." *Id.*, 12 Cal.3d at 555, 116 Cal.Rptr. 245, 526 P.2d 253. Later, the *Ezekial v. Winkley* court applied the doctrine of fair procedure to managed care organizations that have the "practical power ... to affect substantially an important economic interest." 20 Cal.3d 267, 277, 142 Cal.Rptr. 418, 572 P.2d 32 (Cal.1977). In that case, the court found that the defendant organizations had "assumed the power to permit or prevent [licensed physicians'] practice of a surgical specialty and to thwart the enjoyment of the economic and professional benefits flowing therefrom," and that "[t]hese are precisely the considerations to which the *Marinship–Pinsker* doctrine applies." *Id.*, 20 Cal.3d at 274, 142 Cal.Rptr. 418, 572 P.2d 32.

More recently, in *Potvin,* the California Supreme Court applied the common-law fair procedures doctrine to health insurance companies that maintain lists of preferred provider physicians to render medical services to insureds. *See* 22 Cal.4th 1060, 1070, 95 Cal.Rptr.2d 496, 997 P.2d 1153. The court found that the provision of health care has a particular public interest, and that "an even greater public interest is at stake when those medical services are provided through the unique tripartite relationship among an insurance company, its insureds, and the physicians who participate in the preferred provider network." *Id.*, 22 Cal.4th at 1070, 95 Cal.Rptr.2d 496, 997 P.2d 1153. Thus, when the insurer "possesses power so substantial that the removal [of a physician from the list] significantly impairs the ability of an ordinary, competent physician to practice medicine ... thereby affecting an important economic interest," the doctrine of fair procedures applies. *Id.*, 22 Cal.4th at 1071, 95 Cal.Rptr.2d 496, 997 P.2d 1153.

 In sum, to be liable for violating the right to fair procedures in California, a private organization must affect the public interest and must "wield substantial power that significantly impairs the affected individuals' ability to work in a particular field." *Sound Appraisal v. Wells Fargo Bank, N.A.,* 717 F.Supp.2d 940, 945–47 (N.D.Cal.2010). Courts have noted that such organizations serve a "gatekeeping" function in that they control entry and exit to a profession or have significant market power and affect the public interest to such an extent that it is appropriate to impose fiduciary obligations. *Id.*, 717 F.Supp.2d at 946–47; *see also Potvin,* 22 Cal.4th at 1071–73, 95 Cal.Rptr.2d 496, 997 P.2d 1153 (detailing the criteria that must be met before the fair procedures doctrine is applied). Here, Capitol West's fair-procedures claim is new to the SAC. Capitol West claims that the Defendants failed to give meaningful notice and otherwise failed to provide fair procedures before "blacklisting" Mr. Massey and other similarly

situated appraisers. Defendants contend that the duty of fair procedures does not apply to their behavior, and in the alternative, that even if the duty of fair procedures applies, Capitol West was afforded such procedures.

### 2. The Second Amended Complaint Does Not Establish That A Duty of Fair Procedures Applies to Defendants.

Capitol West cites to several cases in an attempt to show that the duty of fair procedures applies to relationships between mortgage lenders and appraisers. *See* Pltf.'s Opp'n (Dkt. # 68) at 14–16 (citing to *Palm Med. Grp., Inc. v. State Comp. Ins. Fund,* 161 Cal.App.4th 206, 74 Cal.Rptr.3d 266 (2008); *Ambrosino v. Metro. Life Ins. Co.,* 899 F.Supp. 438 (N.D.Cal.1995); *Ascherman v. San Francisco Med. Soc'y,* 39 Cal.App.3d 623, 114 Cal.Rptr. 681 (1974); *Delta Dental Plan v. Banasky,* 27 Cal. App.4th 1598, 33 Cal.Rptr.2d 381 (1994)). However, these cases pertain to health insurance companies and/or the provision of medical services, which, as stated above, the California courts have already determined satisfies the public interest requirement of the fair procedures doctrine. As Defendants point out, the fair procedures doctrine is applied narrowly. Capitol West cites to no cases applying the doctrine in the context of a mortgage lender's exclusion of appraisers from its approved appraiser list.

Furthermore, a district court in California recently found that an appraisal-related action is *not* subject to the fair procedures doctrine. In *Sound Appraisal,* a case similar to this one, the Northern District of California considered a fair-procedures claim against Wells Fargo Bank and other mortgage originators and servicers. *See Sound Appraisal,* 717 F.Supp.2d 940. The plaintiffs in that case were independent contractors that provided real estate appraisals to mortgage brokers and mortgage lenders. The plaintiffs alleged that when they refused to alter their appraisals upon the defendants' request, they were removed from the defendants' approved panel of appraisers and lost business as a result.

The court found that the duty of fair procedures did not apply, noting that "Defendants simply made a choice not to do business with Plaintiffs; they did not exercise power as a gatekeeper of a profession nor did they prevent Plaintiffs from pursuing employment from others." *Sound Appraisal,* 717 F.Supp.2d at 947. Importantly, the court found that the plaintiffs had not alleged "that Defendants control the appraising profession through licensing, regulating, training or in any other manner such that ... removing Plaintiffs from a list of approved appraisers substantially impaired their ability to continue to appraise property in their particular geographic area." *Id.,* 717 F.Supp.2d at 947.

Similarly, Capitol West has not alleged sufficient facts to establish that a duty of fair procedures applies to Defendants. Capitol West does not allege that the Defendants control the appraisal profession or limit entry to or exit from the profession itself. Even assuming that Countrywide has "enormous size and clout in the mortgage market," *see* ¶ 6, Capitol West does not allege that the Defendants have monopoly power over the appraisal profession.[4] Capitol West claims that it has lost business as a result of being "blacklisted," but evidence of loss of income is not con-

---

**4.** In fact, Capitol West's allegations show that the appraisal profession is regulated by governmental organizations, not private businesses such as Countrywide. *See* ¶¶ 185–87 (describing notices from state and federal agencies regarding appraiser practices and regulations).

clusive proof that placement on the list reduces income so substantially as to impair Capitol West's appraisers' ability to practice their profession. *See Potvin,* 22 Cal.4th at 1072, 95 Cal.Rptr.2d 496, 997 P.2d 1153. Moreover, Capitol West merely speculates that other mortgage brokers will not use Capitol West for appraisal due to its place on the Defendants' exclusionary list. Capitol West presents no evidence to show that this has indeed occurred, and the court will not make such an assumption. Capitol West has not established that a duty of fair procedures applies to the Defendants, and thus Capitol West's common-law fair procedures claim fails.[5]

### D. Plaintiff's Tortious–Interference Claim Remains Deficient.

██ The court previously found that Capitol West's tortious-interference allegations were "too vague to establish the existence of an economic relationship or the Defendants' knowledge of such relationships." Order (Dkt. # 53) at 12. Capitol West argues that adding the names of particular mortgage brokers that will allegedly not work with Capitol West satisfies the court's concern, but it is mistaken because the allegations are still conclusory with regard to Countrywide's knowledge. *See* ¶¶ 197–198 (identifying Mr. Massey's relationships with particular firms, and alleging that Countrywide knew of those relationships and also knew that placing Mr. Massey on the exclusion list would interfere with and damage the relationships). And furthermore, as the court noted in the previous order, given that the court has found the SAC to be deficient as to the unlawfulness of Defendants' conduct, Capitol West has not adequately stat-

ed an "independent wrong" to support the tortious interference claim.

Though Capitol West cites *Horton v. Nat'l City Mortgage Servs. Co.,* 2010 WL 1253994, 2010 U.S. Dist. LEXIS 27954 (C.D.Ill. Mar. 24, 2010), to support the viability of its tortious-interference claim, that case is factually distinguishable. In that case, the defendant published the fact that the plaintiff had been placed on an appraiser blacklist, but did not publish the names of other blacklisted appraisers. The plaintiff's allegations detailed her development of her business relationships, the context in which the defendant as aware of plaintiff's business relationships, and why it was unjustified for defendant to publish information about the plaintiff's spot on the blacklist. *Horton,* 2010 WL 1253994 at *2–3, 2010 U.S. Dist. LEXIS 27954 at *7–8. The *Horton* court found those allegations to be sufficient to withstand a motion to dismiss, but Capitol West's allegations in this case do not approach that level of detail and plausibility. Thus, the tortious-interference claim is deficient.

### E. CFC, CW Bank, and BoA Must be Dismissed.

In Defendants' opening brief, they argue that because the SAC alleges no specific conduct by either CFC, CW Bank, or BoA, those Defendants must be dismissed. Capitol West did not address this argument in its Opposition. *See* Defs.' Reply at 1. Because the court agrees that the SAC does not identify with any specificity any conduct by CFC, CW Bank, or BoA, those Defendants could be dismissed on this alternative ground.

---

**5.** Because the court finds that no basis exists for applying the duty of fair procedures to the Defendants, the court need not decide whether such procedures were in fact provided to Capitol West.

**F. No Amendment Shall be Permitted.**

Capitol West did not request leave to amend, in the event that the court found the SAC to be deficient. Given that the court has considered Capitol West's third attempt to draft a complaint in this litigation, and again found the pleading to be deficient, the court will dismiss the SAC without leave to amend. *See Moore,* 885 F.2d at 542 (denying leave to file a third amended complaint, given that previous deficiencies had not been cured).

## IV. CONCLUSION

For the reasons explained above, the court GRANTS Defendants' motion (Dkt. # 61).